43 A.3d 629 (2012)
305 Conn. 51
STATE of Connecticut
v.
Kenneth John OTTO, Sr.
No. 18353.
Supreme Court of Connecticut.
Argued January 13, 2012.
Decided June 5, 2012.
*632 Adele V. Patterson, senior assistant public defender, for the appellant (defendant).
Timothy J. Sugrue, assistant state's attorney, with whom, on the brief, were Gail P. Hardy, state's attorney, and David L. Zagaja, senior assistant state's attorney, for the appellee (state).
ROGERS, C.J., and NORCOTT, PALMER, ZARELLA, McLACHLAN, EVELEIGH and HARPER, Js.
NORCOTT, J.
Following a jury trial, the defendant, Kenneth John Otto, Sr., was convicted of the murder of the victim, Shamaia Smith, in violation of General Statutes § 53a-54a,[1] and two counts of tampering with evidence in violation of General Statutes § 53a-155 (a)(1),[2] in connection with his subsequent attempts to conceal the crime. The defendant appeals[3] from the trial court's judgment of conviction of murder, claiming that: (1) there was insufficient evidence to prove the element of specific intent necessary to support the murder conviction; and (2) the prosecutor's argument that the jury should find the defendant guilty of murder because he destroyed evidence that would have been probative of his intent deprived him of a fair trial by impermissibly shifting to him the burden of proof regarding intent. Guided by, inter alia, State v. Sivri, 231 Conn. 115, 646 A.2d 169 (1994), we conclude that the jury reasonably could have inferred the defendant's specific intent from the evidence presented at trial, and we further conclude that the statements made by the prosecutor in closing arguments did not improperly shift the burden of proof. Accordingly, we affirm the judgment of the trial court.
The record reveals the following facts that the jury reasonably could have found, and procedural history. The victim, who was last seen on the afternoon of March 14, 2007, worked as a dancer at Kahoots, an exotic dance club located in Vernon, where the defendant was a frequent patron up until the time that the victim disappeared.[4] Beginning several weeks prior to the victim's disappearance, the defendant and the victim initiated a personal relationship outside of her work at Kahoots. The defendant and the victim spoke on the telephone several times in February, 2007, and, on one occasion prior to her disappearance, on March 9, 2007, the defendant gave the victim a ride to various places in his truck.[5] On the afternoon *633 of March 14, 2007, the victim left her parents' house, where she and her boyfriend lived, indicating to her boyfriend that she was going to work and meeting up with a client who owned a large parcel of property and drove a black truck. The victim did not show up for work that evening, nor did she return home that night, and no one from her family had any further contact with her after she left the house that afternoon.
The victim's family, after becoming concerned about the lack of contact from her, filed a missing persons report with the East Hartford police department on March 16, 2007. Upon investigation of the missing persons report, the police identified the defendant as an individual who potentially had information regarding the then missing victim, on the basis of a voice mail that the defendant had left for the victim prior to her disappearance, and a telephone call that the defendant had made to the victim's house telephone number after her disappearance. First, the victim's family discovered a voice mail on the victim's cell phone from "Kenny" that was left on the morning of March 14, 2007, stating that the caller wanted to get together with the victim. Second, the defendant had telephoned the victim's house telephone on March 17, 2007, and when the victim's mother answered, the defendant said: "Shamaia, call your mom and dad. They [are] worried about you." He would not identify himself and hung up when the victim's mother asked who was calling, but the defendant did identify himself when the victim's father returned the call to the number revealed by the caller identification feature on the house telephone.[6] The defendant also spontaneously, and without explanation, stated to the victim's father during this call that he had a physical problem that rendered him unable to be sexually active.
The victim's family provided the police with the information about these calls placed by the defendant, and Raymond Cheverier, an East Hartford police officer, followed up with the defendant to see if he had any information about the then missing victim. After being informed that the victim had been reported missing, the defendant told Cheverier that he had given the victim a ride to another Kahoots exotic dance club located in East Hartford[7] *634 around 4:30 p.m. on March 14, 2007, but had not seen her since, and that he was sick that evening and had stayed in bed for the next three days.[8] The defendant also stated that the victim had told him that she intended to stay with a female friend for a few days.
On March 21, 2007, investigators from the East Hartford police department went to the defendant's house and asked to speak with the defendant inside his home about the victim in order to continue the investigation of the missing persons report. The defendant indicated that he preferred not to disturb his wife, and asked to talk to the investigators at the police station instead. Prior to leaving for the police station, unprompted by the investigators, the defendant stated to Donald Olson, an investigator: "It's sad ... about Mya," but did not elaborate further on that statement. During the subsequent interview at the police station, the defendant gave the investigators an account of his personal relationship with the victim and his interactions with her on the night of March 14, 2007, which was memorialized in a sworn statement that eventually was read to the jury at trial. In that statement, the defendant again indicated that he had picked up the victim in the afternoon of March 14, 2007, and had dropped her off at the Kahoots in East Hartford at her request, but denied any knowledge of what had happened to her after that time.
On March 21, 2007, the police also discovered that the defendant owned a seventy-five acre parcel of undeveloped land in Stafford (Stafford property). Thereafter, on March 23, 2007, the East Hartford police traveled to the Stafford property to search for the missing victim, during which time detectives entered the property and searched an unlocked[9] camper/trailer (trailer) and the other unsecured areas they discovered on the property that were large enough to conceal a body. The police also conducted a helicopter flyover of the Stafford property at that time, during which they photographed the site and observed the trailer, two sheds, a fire pit, some tractors, and footprints and tire tracks in the snow that had fallen on March 16, 2007. The police did not find the victim on the property, but observed that the fire pit was not snow covered.
Continuing their investigation, the police again sought to speak with the defendant at his house on April 7, 2007, but the defendant suggested meeting with the officers at a Dunkin' Donuts in East Windsor to talk, instead. After arriving at the Dunkin' Donuts, but before the officers asked the defendant any questions regarding his interactions with the victim, the defendant volunteered information about a moral turpitude clause in his employment contract, which provided that he could not do anything to damage his company's *635 reputation, and stated that, if he violated the clause, he "could be out a lot of money." Shortly after arriving at Dunkin' Donuts, which was busy with Saturday morning customers, the defendant suggested that they go somewhere more private to continue talking, and further suggested the parking lot of another exotic dance club located on the same street as the Dunkin' Donuts.
When they arrived at the parking lot, the defendant entered the police cruiser with the officers to continue the conversation. After engaging the defendant in a casual conversation about his interactions with the victim, the officers suggested that they visit some of the places the defendant had visited with the victim on March 9, 2007. The defendant remained in the police cruiser while guiding the officers to a convenience store and Asnuntuck Community College,[10] and informed the officers that, on March 9, 2007, the victim had expressed a desire to obtain her high school equivalency diploma and to attend cosmetology school. The defendant indicated that he had given the victim $500 on that date to help her attain this goal. He also informed the officers that he had discussed his erectile dysfunction with the victim on March 9, 2007, and that he was unable to perform sexually with her.
Although the defendant seemed to be forthcoming with information requested by the officers up to that point in the conversation, when the officers began asking the defendant about his interactions with the victim on March 14, 2007, he became "slightly agitated." Additionally, when confronted with information concerning the victim's cell phone records, the defendant acknowledged that he owned property in Stafford, but continued to maintain that he had never brought the victim there. The police then asked to perform a consent search of the truck the defendant had used when driving the victim around, to which the defendant agreed.
The officers and the defendant then returned to the defendant's house, where the truck was located, performed the consent search of the truck, and found .40 caliber ammunition, .357 caliber ammunition and.38 caliber ammunition in a locked gun safe located between the two front seats.[11] After completing the consent search of the truck, the officers discussed arrangements for a consent search of the defendant's Stafford property, which was ultimately scheduled for April 8, 2007, the following day. On April 8, 2007, officers from the East Hartford police department, with the help of four teams of Connecticut state police cadaver dogs, executed a consent search of the Stafford property, during which two of the cadaver dog teams alerted on a large fire pit located in a large clearing on the property, exhibiting behavior indicating the presence of human remains.[12] Shortly after the dogs alerted on *636 the fire pit, the defendant revoked his consent to continue the search, and both the East Hartford police and the state police officers left the Stafford property.
On the basis of the results from the consent search on April 8, 2007, the East Hartford police sought and obtained search and seizure warrants for the defendant's truck, which they executed on April 12, 2007,[13] and his Stafford property, which they executed on April 16, 2007. The search of the defendant's Stafford property, which began on April 16, 2007, lasted approximately four days and yielded numerous items of evidentiary value. First, when police arrived to execute the warrant, they found that the defendant had dragged the trailer from the primary trailer site, where they had observed it during the April 8, 2007 consent search, down to the secondary site near the large fire pit, and that the living portion of the trailer had been ripped from the frame and burned.[14] The police also observed the defendant operating a backhoe, digging a hole in which he could bury the remains of the trailer. Furthermore, after excavating the dirt and ash from the large fire pit in the secondary site, the police discovered several pieces of human tissue, numerous bone fragments and teeth, a portion of a human foot, a set of keys that were later determined to belong to the victim, two .40 caliber shell casings and a.38 Special caliber hollow point bullet. The police also recovered a third .40 caliber spent shell casing near, but not in, the large fire pit. The police continued the search of the property with the primary trailer site, from which they recovered an empty Cheetos bag, a Clorox Ready-Mop with traces of human blood on the handle and mop head, a six foot by two foot piece of carpet with a four foot by one foot human bloodstain (carpet piece), and a vacuum cleaner bag that contained several pieces of plastic and linoleum, both of which also had traces of human blood.
On April 20, 2007, before the police had informed the defendant that they had recovered the shell casings and the bullet from the large fire pit, the defendant's attorney contacted Olson, asking him to come take the defendant's guns for testing and safekeeping. Among the guns seized from the defendant's locked gun safe were a .357 caliber revolver, a .38 Special caliber revolver and a .40 caliber semiautomatic pistol that had been disassembled and was missing its barrel when it was surrendered. When asked if he knew what had *637 happened to the missing barrel, the defendant told Olson that he had lost it.
The items recovered from the defendant's Stafford property and the guns were then submitted for forensic testing. The tissue samples, bone fragments and charred remains of the human foot taken from the large fire pit were all tested for DNA evidence and were confirmed as the remains of the victim. After conducting DNA analysis of the bloodstains from the mop and the pieces of plastic and linoleum found in the vacuum cleaner bag recovered from the primary trailer site, the forensic analysts were able to confirm that the blood on all of these items also had come from the victim.[15] With regard to the bloodstain on the carpet piece, the forensic analysts were able to confirm that a four foot by one foot continuous section of it was stained with human blood, but because the carpet piece had been soaked by heavy rains prior to its recovery by police, the analysts were unable to generate a DNA profile from that, and were therefore unable to confirm that the blood on the carpet piece had come from the victim.
Edward T. McDonough, deputy chief medical examiner for the state, testified that the remains recovered from the fire pit had a gasoline type odor. He also testified that nothing was found in the tissue sample during the toxicology screening, but based on the fact that the specimen submitted for testing had been exposed to high levels of heat, a negative test result did not conclusively establish that there were no drugs or alcohol in the victim's body at the time of her death. McDonough further testified that, because of the fragmentary and burned condition of the remains, it was impossible to determine the cause or the manner of death.
Albert Harper, a forensic anthropologist and director of the Henry C. Lee Institute of Forensic Science, testified that he was asked to examine the bone fragments recovered from the large fire pit as a consultant with the medical examiner's office. He indicated that the bones exhibited characteristics of having been burnt in "a very hot fire." He testified further that the level of cremation of the remains was close to that of commercial cremation, would have required "[l]ots of wood" and consistent temperatures of 1500 to 2000 degrees over the course of many hours, possibly spanning as many as several days. Although, like McDonough, Harper indicated that he could not determine whether there had been any trauma to the bones prior to the cremation because the fire process caused significant fragmentation of the bones, he was able to determine, based on the fact that the skin and a portion of the muscle tissue on the remains of the foot recovered were still intact, that the victim had been dead for approximately one month prior to the discovery of the remains.
Beyond the scientific findings he made on the basis of his examination of the bone fragments that left him unable to point to any physical evidence to indicate that the victim had been the subject of a homicide, Harper, nevertheless, further testified that, in his experience, "a body that has been deliberately cremated is indicative of someone wanting to make sure that that *638 body is not found, and that would suggest that it's a homicide.... Based upon all the cases I've ever been associated with, when somebody tries to hide a body this way, it's because there was a homicide. There's a reason to hide it.... Someone went to a lot of trouble to dispose of this body."
Finally, with regard to ballistics evidence, Edward Jachimowicz, supervisor of the firearms and tool mark section of the state police forensics laboratory, testified that the bullet that had been recovered from the large fire pit was a .38 Special caliber bullet that could have been fired from either a .38 Special caliber revolver or a .357 caliber revolver, but that the bullet was too damaged to determine conclusively that it had been fired from either of the revolvers that the defendant had surrendered. He further testified that, although the .40 caliber semiautomatic pistol the defendant had surrendered was missing its barrel, and thus was not functional when surrendered, Jachimowicz was able to perform a test fire of the pistol using a replacement barrel from the state police reference collection. From this test fire, Jachimowicz was able to compare the breech face marks and the firing pin impressions along with the extractor marks on the test fired shell casings to the .40 caliber shell casings found at the defendant's Stafford property. On the basis of this comparison, Jachimowicz testified that it was his opinion that the three spent shell casings recovered from the Stafford property had been fired by the .40 caliber pistol that the defendant had surrendered.
The defendant then presented the following evidence to the jury. He highlighted the fact that there was a shooting range on the property located near the primary trailer site, and also presented testimony from Robert Malt, a family friend of the defendant, who testified that he and his wife had fired both revolvers and semiautomatic pistols on the defendant's property and, on at least one occasion, had fired those guns near the large fire pit in the secondary site. The defendant also presented evidence that the police had not performed a thorough investigation of the circumstances surrounding the victim's death, highlighting the fact that two cigarette butts found in a trash can on the primary trailer site had not been tested for DNA, despite testimony that the defendant did not smoke, and that the forensic analysts were unable to recover any identifiable fingerprints from the handle of the mop also recovered from the primary trailer site. On the basis of the foregoing evidence, the jury found the defendant guilty of murder and of two counts of tampering with evidence. The trial court sentenced the defendant to sixty years incarceration for murder and five years incarceration on each count of tampering with the evidence, to be served concurrently with one another and with the murder sentence, for a total effective sentence of sixty years incarceration. This direct appeal from the murder conviction followed.

I
The defendant first claims that the state failed to prove beyond a reasonable doubt that he intended to kill the victim. He maintains that, in the absence of any evidence to show the cause and manner of death, the circumstances surrounding the death or a motive to kill the victim, the evidence was insufficient to prove that he acted with the specific intent to cause the victim's death to support a conviction for murder. In response, the state contends that, given our decision in State v. Sivri, supra, 231 Conn. at 115, 646 A.2d 169, there was sufficient evidence of the defendant's entire course of conduct from which the jury reasonably could infer the existence *639 of his intent to kill the victim. We agree with the state.
The standard of review we apply to a claim of insufficient evidence to support a criminal conviction is well established. "In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) State v. Brown, 299 Conn. 640, 646-47, 11 A.3d 663 (2011).
"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt.... If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) State v. Gary, 273 Conn. 393, 405, 869 A.2d 1236 (2005). Moreover, "[w]here a group of facts are relied upon for proof of an element of the crime it is their cumulative impact that is to be weighed in deciding whether the standard of proof beyond a reasonable doubt has been met and each individual fact need not be proved in accordance with that standard. It is only where a single fact is essential to proof of an element, however, such as identification by means of fingerprint evidence, that such evidence must support the inference of that fact beyond a reasonable doubt." (Emphasis added; internal quotation marks omitted.) State v. Grant, 219 Conn. 596, 604-605, 594 A.2d 459 (1991).
As we have often noted, however, "proof beyond a reasonable doubt does not mean proof beyond all possible doubt ... nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal.... On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) State v. Brown, supra, 299 Conn. at 647, 11 A.3d 663. Furthermore, "[i]t is immaterial to the probative force of the evidence that it consists, in whole or in part, of circumstantial rather than direct evidence." State v. Grant, supra, 219 Conn. at 600, 594 A.2d 459.
Finally, "[w]e have held that [t]he specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim.... Because direct evidence of the accused's state of mind is rarely available ... intent is often inferred from conduct ... and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom.... Intent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death.... Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a *640 defendant intended the natural consequences of his voluntary conduct.... In addition, intent to kill may be inferred from evidence that the defendant a had motive to kill." (Citations omitted; internal quotation marks omitted.) State v. Gary, supra, 273 Conn. at 406-407, 869 A.2d 1236.
In the present case, the defendant concedes that there was sufficient evidence to establish that he had "tried to conceal his connection with [the victim's] death on his property." The sole question before us, then, is simply whether the jury had sufficient evidence from which to infer that the defendant intended to kill the victim because "the jury could not properly have inferred an intent to commit murder from the mere fact of the death of the victim, [or] even from her death at the hands of the defendant." State v. Crafts, 226 Conn. 237, 248, 627 A.2d 877 (1993).
To begin, we acknowledge the absence, in the present case, of certain types of evidence that we have identified in prior cases as supporting an inference of an intent to kill. Admittedly, in the present case, there was no evidence of the cause and manner of death or the specific type of wound inflicted on the victim. See, e.g., State v. Chace, 199 Conn. 102, 106, 505 A.2d 712 (1986) (evidence of stab wounds created with great force and directed blows continuing after victim had retreated and had been seriously injured deemed sufficient evidence of intent). Nor was there any evidence of the defendant's prior planning or preparation. See, e.g., State v. Crafts, supra, 226 Conn. at 251, 627 A.2d 877 (evidence of arranging woodchipper rental prior to murder as part of prearranged plan to kill victim and conceal her remains deemed sufficient evidence of intent). Nevertheless, even in the absence of evidence of a body or even body parts, the specific type of weapon used, the specific type of injury inflicted on the victim or any prior planning, preparation or motive, this court has determined that other types of evidence, when viewed cumulatively, can be sufficient to support the jury's finding of an intent to kill. See State v. Sivri, supra, 231 Conn. at 127, 646 A.2d 169.
In State v. Sivri, supra, 231 Conn. at 127-30, 646 A.2d 169, this court concluded that the jury had been presented with six categories of evidence that supported an inference that the defendant therein had the intent to kill. First, the state introduced into evidence a section of carpet on which there was an eleven inch by fourteen inch bloodstain that had soaked through to the carpet backing, and testimony from the director of the state police forensic laboratory that the loss of approximately one quarter of the total blood in the body of an average sized woman would have been required to create a stain that size. Id., at 127-28, 646 A.2d 169. Second, the state presented testimony that only an injury caused by an instrument capable of cutting a blood vessel or cutting deeply into the body would have resulted in the victim having lost that amount of blood in the time frame presented. Id., at 128, 646 A.2d 169. Third, the state presented testimony that such an instrument, likely with a sharp edge or point, must have been used vigorously enough to cut or penetrate deep enough to cause massive bleeding. Id., at 129, 646 A.2d 169. Fourth, because the victim was killed in the defendant's family room, and the type of instrument required to cause the victim's bleeding would not ordinarily be stored in a family room, this court determined that the jury could infer that the defendant either had such a weapon in his possession while he was in that room or had obtained it from another part of the house. Id. Fifth, the state presented evidence that the defendant failed to summon medical help to *641 render aid for the victim's serious injury, which supported an "antecedent intent to cause death." Id. Finally, there was very strong evidence of the defendant's consciousness of guilt. Id., at 130, 646 A.2d 169. From this evidence, we concluded that the jury reasonably could have inferred not only that the defendant had killed the victim, but also that he had done so intentionally. Id., at 130-31, 646 A.2d 169.
Guided by, inter alia, our decision in State v. Sivri, supra, 231 Conn. at 130-31, 646 A.2d 169, which arguably presented even less evidence from which the jury could have drawn reasonable inferences regarding the defendant's intent than that presented in the present case, we conclude that the circumstantial evidence and the reasonable inferences the jury could draw therefrom in the present case are sufficient to support the jury's finding that the defendant had the requisite intent to kill the victim. First, the defendant concedes, and we agree, that the evidence of the carpet piece with the four foot by one foot human bloodstain, the pieces of linoleum, and the blood on the mop presented at trial was sufficient to support a finding that the victim had "lost a significant amount of blood" on the floor of the trailer and that the defendant had attempted to clean it up. Although we acknowledge that there was no testimony regarding the specific amount of blood loss that the victim had experienced, the jury nevertheless reasonably could have inferred, from the fact that at least part of the very large, approximately human shaped bloodstain had soaked through the carpet to the linoleum below, that the victim had lost a life-threatening amount of blood there. Indeed, at approximately one foot by four feet in size, the bloodstain on the carpet piece was not only approximately human shaped, but also nearly four times the size of the bloodstain considered in State v. Sivri, supra, at 127-28, 646 A.2d 169.[16] From this, the jury also could have inferred that only a grievous injury would cause the victim to lose that amount of blood.
Second, although there was no physical evidence to indicate the type of injury or the type of weapon that inflicted such a grievous injury, the jury reasonably could have inferred, from the circumstantial evidence presented, that the defendant shot the victim. Specifically, of the guns that the defendant had surrenderedand surrendered prior to being notified that the police had recovered spent shell casings from the large fire pitthe only one missing any parts was the gun that the firearms expert ultimately was able to match to those spent shell casings. Using their common sense and experience,[17] the jurors reasonably could have inferred that the defendant had removed the barrel of the .40 caliber pistol and surrendered it before learning that the *642 police had found ballistic evidence because he knew he had shot the victim with that gun and hoped that removing the barrel would hinder forensic comparison of his gun to any evidence that the police subsequently recovered from the Stafford property. Although we acknowledge that there was no evidence to establish which part of the victim's body the defendant shot, we have held that a person "who uses a deadly weapon [such as a gun] upon a vital part of another will be deemed to have intended the probable result of that act, and from such a circumstance a proper inference may be drawn in some cases that there was an intent to kill." (Internal quotation marks omitted.) State v. Tomasko, 238 Conn. 253, 259, 681 A.2d 922 (1996).
Third, the evidence supports the inference that the defendant shot the victim in the trailer. The items recovered from which the police were able to obtain blood samples matching the victimthe carpet piece, pieces of linoleum in the vacuum cleaner bag, and the mopwere all items that would have been found or used in the trailer. Furthermore, the jury could infer that it was not likely that the defendant would keep a dangerous and valuable gun in the consistently unlocked trailer, when he had locked gun safes in both his truck and his house wherein he kept ammunition and guns. From this, the jury could also infer that, before using the gun, the defendant either had it in his possession or had retrieved it from the locked gun safe in his truck in which, the jury was also told, he also stored ammunition for that gun. We have held that transporting a deadly weapon to the location where that weapon ultimately is used supports an inference of an intent to kill. See id. (defendant's retrieval of gun from another room prior to shooting victim supported inference of intent); State v. Sivri, supra, 231 Conn. at 129, 646 A.2d 169 (defendant obtaining weapon capable of stabbing or cutting from another room in house prior to use of weapon on victim in family room supported inference of intent).
Fourth, the evidence presented supports a finding that the defendant did not call, or even attempt to call, for medical assistance for a wound that left the victim bleeding a significant amount. From the defendant's cell phone records, the jury reasonably could have found both that it was possible to obtain a cell phone signal strong enough to allow the defendant to place a call for emergency help while on the Stafford property and that the defendant did not place such a call on the evening of March 14, 2007. We have often noted that "it can be inferred that, if the defendant has caused a grievous wound that could cause the victim's death if not treated promptly, the failure to summon that treatment is consistent with an antecedent intent to cause death." State v. Sivri, supra, 231 Conn. at 129, 646 A.2d 169; see also State v. Francis, 228 Conn. 118, 128-29, 635 A.2d 762 (1993) (evidence that defendant stabbed victim and immediately left scene without rendering assistance was sufficient to infer intent), cert. denied, 537 U.S. 1056, 123 S.Ct. 630, 154 L.Ed.2d 536 (2002); State v. Greenfield, 228 Conn. 62, 78, 634 A.2d 879 (1993) (victim found "bloodied, unconscious, his forehead visibly compressed, outside his blood-soaked apartment" with "not the slightest evidence that the defendant made any attempt to help the victim" was sufficient evidence to infer intent).
Fifth, there was a significant amount of evidence of the defendant's consciousness of guilt, including: (1) telling Olson that it was "sad ... about Mya" before anyone knew what had happened to her; (2) falsely maintaining to the police that the victim had never been to his property; (3) falsely maintaining to the police and the victim's *643 family members that he had dropped the victim off at the East Hartford Kahoots and did not know what had happened to her after that; (4) telephoning the victim's house telephone number when he had only ever contacted her on her cell phone prior to her disappearance, and when he knew it was because she had not returned to her house that her family had reported her missing; (5) surrendering a number of firearms to the police prior to learning that the police had recovered shell casings and a bullet from the large fire pit; (6) surrendering only one gun with a missing barrel, which happened to be the only gun to match the shell casings recovered from the fire pit; (7) cleaning, demolishing and attempting to bury the remains of the trailer; (8) and, most significantly, cremating the victim's body in an extremely hot outdoor fire over the course of up to two days. From this evidence of the defendant's consciousness of guilt, the jury reasonably could have inferred that the defendant, knowing that he had shot and killed the victim in the trailer, burned the victim's body and whatever other evidence he could not satisfactorily clean to prevent discovery of his involvement in her death. The defendant contends that consciousness of guilt can only be used to prove a guilty act, and not the level of intent that attended such an act, and we have held that evidence of "guilty consciousness is perhaps the strongest evidence ... that the person is indeed the guilty doer...." (Internal quotation marks omitted.) State v. Joly, 219 Conn. 234, 251, 593 A.2d 96 (1991). Nevertheless, we have also held that "consciousness of guilt evidence [is] part of the evidence from which a jury may draw an inference of an intent to kill." State v. Sivri, supra, 231 Conn. at 130, 646 A.2d 169; see also State v. Patterson, 229 Conn. 328, 333-34, 641 A.2d 123 (1994) (concealing murder weapon and immediately fleeing scene after shooting victim considered along with removing potential witness from scene prior to shooting to infer intent).
Finally, the state presented some evidence of possible motives for the defendant killing the victim, namely, the moral turpitude clause in the defendant's employment contract and the possibility that the defendant was unable to perform sexually with the victim. The jury was aware that the defendant had spontaneously volunteered the information about the moral turpitude clause in his employment contract to the police, as well as his previous experience with erectile dysfunction with the victim to both the victim's father and the police, without being posed questions related to those facts. From this evidence, the jury reasonably could have inferred that the defendant had a possible motive to kill the victim, which the jury could have considered when evaluating the defendant's intent. Although motive is not an element of the crime of murder that the state must prove beyond a reasonable doubt, we have nonetheless held that an "intent to kill may be inferred from evidence that the defendant had motive to kill." State v. Gary, supra, 273 Conn. at 407, 869 A.2d 1236.
In sum, we conclude that there was sufficient evidence for the jury reasonably to have inferred the following: (1) the defendant shot and killed the victim in the trailer; (2) causing her grievous injury; (3) using his .40 caliber semiautomatic pistol; (4) that he brought with him into the trailer, either having it in his possession initially or retrieving it from the truck; (5) the victim lay on the carpet, bleeding massively from the wound; (6) after inflicting the wound, the defendant did not summon medical assistance for the victim; and (7) shortly after killing the victim, the defendant took extraordinary and gruesome measures to destroy the evidence in order *644 to avoid detection and apprehension. Although the evidence certainly did not mandate an inference of an intent to kill, we conclude that, cumulatively, when viewed in the light most favorable to sustaining the verdict, it reasonably supports the inference of an intent to kill that the jury drew.
"That the jury might have drawn other possible inferences from these facts is not sufficient to undermine its verdict, since proof of guilt must be established beyond a reasonable doubt, not beyond a possible doubt.... [I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Citations omitted; internal quotation marks omitted.) State v. Grant, supra, 219 Conn. at 604, 594 A.2d 459. In the present case, the defendant's intent, as an element of the crime of murder, was proven beyond a reasonable doubt by the cumulative impact of the evidence and the rational inferences drawn therefrom. From all of the evidence, we conclude that the jury reasonably could have found that the defendant was guilty of the victim's murder.

II
We next address the defendant's claim that the prosecutor, in his closing argument, improperly shifted to the defendant the burden of proof regarding his intent and, thus, deprived him of a fair trial. Although the defendant did not object to any statements made during the prosecutor's closing argument,[18] he now claims that the prosecutor improperly told the jury that it could, and should, use the evidence that the defendant had destroyed against him when considering whether he was guilty of murder, and also that acquitting him would "[reward]" him for destroying the evidence that would have proven his intent to kill the victim. These statements, the defendant claims, not only reduced the level of certitude required for conviction, but also improperly invited the jury to punish the defendant for destroying evidence of his intent. In response, the state argues that the prosecutor's remarks, viewed in the context of the entire trial and the entire closing argument, properly asked the jury to infer an intent to kill, and to convict the defendant on the basis of the totality of the evidence adduced at the trial, including the evidence of the defendant's consciousness of guilt. We agree with the state and, therefore, conclude that the challenged statements were not improper.
To begin, we set forth the standard of review and the law governing *645 claims of prosecutorial impropriety. "[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial."[19] (Internal quotation marks omitted.) State v. Angel T., 292 Conn. 262, 275, 973 A.2d 1207 (2009). "This court previously has acknowledged: [P]rosecutorial [impropriety] of constitutional magnitude can occur in the course of closing arguments.... In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument.... Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom.... Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case.... While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Internal quotation marks omitted.) State v. Camacho, 282 Conn. 328, 367-68, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S.Ct. 388, 169 L.Ed.2d 273 (2007). Furthermore, prosecutors are not permitted to misstate the law; State v. Rizzo, 266 Conn. 171, 262 n. 49, 833 A.2d 363 (2003); and suggestions that distort the government's burden of proof are likewise improper; State v. Stevenson, 269 Conn. 563, 581, 849 A.2d 626 (2004); because such statements are likely to improperly mislead the jury. Finally, as we recently clarified in State v. Payne, 303 Conn. 538, 562-63, 34 A.3d 370 (2012), "when a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show ... that the remarks were improper...."
A review of the statements made by the prosecutor, in the context of the entire closing argument, is necessary to address the defendant's challenges. First, the prosecutor began his argument regarding the charge of murder by stating: "When you consider [the almost complete cremation of the victim's body and the destruction of the trailer], when you consider the other evidence that was presented during this trial, use that as a framework and understand that that answers a lot of questions to things you may not know." The prosecutor continued: "The judge will never tell you in his instructions that [the defendant] should be rewarded for his conduct because he took away your ability, law enforcement's ability to determine a cause of death; he is not to be rewarded for that. If you determine that that actual piece of evidence was intentionally erased from existence because of his conduct, you can most certainly use it against him, and it answers a lot of questions for you ladies and gentlemen."
*646 Furthermore, specifically in support of the murder conviction, the prosecutor argued: "The second thing you have to ultimately find proven is what did he do? And the judge is going to go through to establish, and be convinced, and proven beyond a reasonable doubt that he is guilty of murder, it must be established that with the intent to cause the death of [the victim], he did cause her death. Nothing less than intentionally. Nothing accidental. Nothing like that. What do we know? Despite his Herculean efforts, what do we know? What evidence was still left behind?" The prosecutor further summarized the evidence recovered from the Stafford property, and then stated that the defendant "most likely shot [the victim]. It's not speculation. Those are pieces of evidence for you to consider. And the reason I say that is we get to a situation of most likely shot. When someone shoots someone, someone forms an intent based on where they shoot them. They form an intent to kill, and you can use that. The judge will talk to you about what type of instrument may be used in causing someone's death, and how you can use that and utilize that in determining what someone's intent is. And the judge will also tell [you] that in most circumstances we prove intent and you ultimately find intent proven by circumstantial evidence. What things do we have to look at to determine what someone's intent was?
"And I get back to likely because we don't know. And, again, this is a portion of I don't know, but the only reason I don't know is because he wouldn't let us know. The incredible effort to destroy the existence of a human being." The prosecutor continued to comment on the defendant's destruction of the trailer, stating: "The trailer speaks volumes, ladies and gentlemen. The destruction of [the victim] may actually pale in comparison to the evidentiary value that that camper held. We could have had a better estimation of the quantity of blood, what actually happened, but we didn't have any of that. You had extreme efforts to clean that camper until he said to himself, no, it's got to go because I can't clean it appropriately enough. It's better than the destruction of her body because that held secrets and clues and evidence that you ultimately would have had if not for his conduct."
The prosecutor concluded his initial summation by stating: "The defendant, by his conduct, declares loud and clear that he is the killer and that he intentionally caused [the victim's] death. Because despite all of his efforts to hide the evidence, destroy evidence, and really eradicate the existence of this evidence, there is enough for you, ladies and gentlemen, to consider the blood shed. The blood shed of [the victim] ... establishes that she was intentionally killed."
Finally, in his rebuttal argument, the prosecutor reiterated that "there is a great deal of evidence that still remained that allows you to determine that [the victim] died from a violent traumatic death.... There is an entire destruction of anything that would have you determine what the cause and manner of death is.... Because even though he did some effective work, things were left [behind].... He caused her death. He intended to cause her death." The prosecutor concluded: "You will never hear the judge tell you, if you conclude that evidence was being hidden or concealed by the defendant, you should award him with a not guilty verdict.... Plenty of remnants were left behind by the defendant. Plenty."
The defendant specifically challenges the prosecutor's arguments that the defendant "erased evidence" and should not be "rewarded for his conduct," claiming that such remarks improperly shifted the burden *647 of proof regarding intent to the defendant. Upon review of the challenged statements, we first observe that the prosecutor accurately predicted that the defendant intended to argue to the jury that, because there was no evidence to prove conclusively the cause and manner of death, the circumstances immediately surrounding the victim's death or a motive for the defendant to kill her, the evidence was insufficient to prove beyond a reasonable doubt that the defendant intended to kill the victim.[20] In his own closing argument, the prosecutor therefore underscored that, despite the defendant's efforts to destroy the evidence most likely to prove his intent, there was sufficient evidence remaining from which the jury could make such an inference. The prosecutor, in informing the jury that the trial court would not instruct it that it was to "[reward]" the defendant for destroying the best evidence of his intent, did not suggest that the jury could convict the defendant based on a speculation regarding his intent. To the contrary, the prosecutor merely informed the jury that the defendant's destruction of some evidence did not preclude a guilty verdict because sufficient evidence remained from which the jury could infer the defendant's intent. In fact, the prosecutor suggested that, on the basis of the evidence presented, it specifically was not speculation for the jury to infer that the defendant intended to kill the victim.
Moreover, contrary to the defendant's claim, the prosecutor's statements did not improperly invite the jury to punish the defendant by convicting him of murder simply because he destroyed evidence that would have aided the jury in determining the defendant's mental state when he killed the victim. As the record reveals, the prosecutor invited the jury to consider the evidence relating to the defendant's gruesome cremation of the victim's body and the destruction of the trailer as part of the evidence that cumulatively supported the inference that the defendant intended to kill the victim. See also part I of this opinion. The record further reveals that, while highlighting the defendant's destruction of evidence, the prosecutor also rounded out the discussion by informing the jury that there was, nevertheless, sufficient evidence left behind to sufficiently support an inference of intent.
On the basis of our review of the record, we conclude that the prosecutor did not improperly invite the jury to apply an incorrect legal standard or improperly suggest that the jury could find the defendant guilty of murder even if it did not find that he had the requisite intent to kill, simply to punish him for destroying evidence. We therefore conclude that the remarks challenged by the defendant were not improper and that "[t]he prosecutor was properly and simply ask[ing] the jury to perform its appropriate function of *648 drawing inferences from the evidence in the case." (Internal quotation marks omitted.) State v. Brown, 256 Conn. 291, 305, 772 A.2d 1107, cert. denied, 534 U.S. 1068, 122 S.Ct. 670, 151 L.Ed.2d 584 (2001). Accordingly, we conclude that the prosecutor's comments were not improper.[21]
The judgment is affirmed
In this opinion the other justices concurred.
NOTES
[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person...."
[2] General Statutes § 53a-155 (a) provides in relevant part: "A person is guilty of tampering with ... physical evidence if, believing that an official proceeding is pending, or about to be instituted, he: (1) Alters, destroys, conceals or removes any record, document or thing with purpose to impair its verity or availability in such proceeding...."
[3] The defendant appeals directly to this court pursuant to General Statutes § 51-199(b)(3).
[4] The defendant's regular appearances at the Vernon Kahoots ceased at or about the same time that the victim disappeared.
[5] The defendant maintained throughout the investigation and the trial that, on March 9, 2007, he and the victim had driven around for a few hours, stopping at a convenience store to buy the victim a bag of Cheetos and a Red Bull energy drink, and then parking for a period of time in the parking lot of Asnuntuck Community College in Enfield before the defendant dropped the victim off at the Mardi Gras bar in East Windsor. He further maintained that he had never taken the victim, at any time, to a seventy-five acre property he owned in Stafford (Stafford property). The victim's cell phone records, however, indicated that, during the time the defendant had admitted to have been driving around with the victim on March 9, 2007, activity on her cell phone connected to the cell phone tower located on the same road as the defendant's Stafford property. Donald Olson, an investigator with the East Hartford police department, testified that these cell phone records led him to believe that the defendant was not being truthful with respect to his movements with the victim on March 9, 2007.
[6] The defendant told police that his purpose in making this telephone call was to give the victim a "hard time" for not staying in touch with her family. There was no explanation as to why the defendant telephoned the victim's house telephone number on this occasion, when he had only contacted the victim on her cell phone up to that point and when he was aware that the victim had not returned home after March 14, 2007.
[7] The victim did not work at the East Hartford Kahoots. When interviewed by the police, none of the staff members at the East Hartford Kahoots recognized the victim, and there is no evidence that the victim entered that location on the night of her disappearance.
[8] Evidence presented regarding the defendant's cell phone records on March 14, 2007, and the following several days, indicated that, contrary to his statement that he was in bed for three days, the defendant was, in fact, out of his house quite a bit during that time. For example, a sampling of the defendant's cell phone records from March 16, 2007, indicated that various calls made that day connected through at least six different cell phone towers, including those located in Ellington, South Windsor, Windsor, Enfield, the Enfield Mall and Stafford. More importantly, the cell phone records also specifically indicated that the defendant's cell phone connected to the tower located on the same street as his Stafford property on the evening of March 14, 2007, and during the day on both March 15, 2007, and March 16, 2007.
[9] There was testimony from Robert Malt, an Otto family friend, indicating that the trailer was not locked all the time and, indeed, every time that police entered the Stafford property prior to the defendant's destruction of the trailer, it was unlocked.
[10] Olson testified that the defendant did not appear to be familiar with the route to Asnuntuck Community College when he attempted to guide the officers to that location. In fact, Olson stated: "We just appeared to be driving aimlessly at one point. I remember turning around somewhere in that area one time, and then to me it just appeared we, all of a sudden, we were there in front of Asnuntuck [Community College]."
[11] The officers did not seize any evidence from the defendant's truck during the consent search on April 7, 2007.
[12] The consent search of the Stafford property focused on two main areas, one area where the trailer was located along with the other various outbuildings, a small fire pit and a shooting range, and another area further into the property where there was a large clearing and a large fire pit. For the sake of clarity, we will refer to the first area as the primary trailer site, and the area containing the large fire pit as the secondary site.
[13] Nothing found in the defendant's truck during the search pursuant to the warrant linked the defendant to the victim's death.
[14] Michael Carpenter, an Otto family friend, testified that on Saturday, April 14, 2007, at the defendant's request, he and his father returned a backhoe they had previously borrowed from the defendant. When Carpenter and his father arrived at the Stafford property on that date, they noticed that the roof and the walls of the trailer had been crushed and that pieces of the trailer were already in a fire located in the large fire pit in the secondary site. Carpenter further testified that he helped the defendant drag the trailer down to the secondary site and throw the rest of it into the large fire pit. Finally, Carpenter testified that he witnessed the defendant pick up the trailer using the backhoe and drop it from approximately ten feet in the air, purportedly to get the rest of the pieces that could be burned off of the trailer frame. Carpenter noted his surprise that the defendant would drop the trailer in that manner because "we were going to use the frame of the trailer to build a sawmill on, [so] we probably shouldn't have dropped it." He also stated that he thought it was "a little unusual to [destroy the camper] on that weekend" because the defendant was under suspicion of killing a girl at that time.
[15] The police were not able to obtain a DNA sample from the victim to which they could compare the DNA results from the items recovered at the Stafford property. Importantly, however, by comparing the DNA results from the items recovered from the fire pit and the blood evidence recovered from the primary trailer site to the DNA profiles of the victim's parents, the forensic analysts were able to confirm that the items recovered from the fire pit and the blood samples were consistent with having come from the biological daughter of the victim's parents.
[16] We acknowledge that, because the carpet piece had been exposed to heavy rain, the bloodstain may have spread throughout a larger portion of the carpet piece than it originally covered, and that the original dimensions of the bloodstain, therefore, may be indeterminable. The fact that the original stain may have been somewhat smaller than one foot by four feet, however, does not preclude a reasonable inference that the victim lost a significant and life-threatening amount of blood on that carpet.
[17] "In deciding cases ... [j]urors are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion." (Internal quotation marks omitted). State v. Ceballos, 266 Conn. 364, 402, 832 A.2d 14 (2003). Indeed, "[i]t is an abiding principle of jurisprudence that common sense does not take flight when one enters a courtroom." State v. Zayas, 195 Conn. 611, 620, 490 A.2d 68 (1985).
[18] We note that "the defendant's failure to object at trial to each of the occurrences that he now raises as instances of prosecutorial impropriety, though relevant to our inquiry, is not fatal to review of his claims." State v. Camacho, 282 Conn. 328, 369, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S.Ct. 388, 169 L.Ed.2d 273 (2007). This does not mean, however, that the absence of an objection at trial does not play a significant role in the determination of whether the challenged statements were, in fact, improper. See State v. Stevenson, 269 Conn. 563, 575, 849 A.2d 626 (2004). To the contrary, "we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time." (Internal quotation marks omitted.) Id., at 576, 849 A.2d 626. With this maxim in mind, we proceed with our review of the defendantgs claim.
[19] Because we conclude that the statements made by the prosecutor in the present case were not improper, we do not reach the question of whether any misconduct rose to the level of denying the defendant of his right to a fair trial. See, e.g., State v. Darryl W., 303 Conn. 353, 375 n. 19, 33 A.3d 239 (2012).
[20] In his closing argument, defense counsel stated that, on the basis of the evidence presented, what happened to the victim "is a guess. And what the state is asking you to do is to guess what happened to [the victim] and therefore guess at what the appropriate verdict is in this case, and that's wrong ... [because the defendant] doesn't have to prove that he's innocent; he's innocent as he sits here right now.

"And that means the state has the burden of proof. They have to prove each and every element of the charges beyond a reasonable doubt." Defense counsel continued: "Is there any, and I mean any evidence before you in regard to what the state claims [the defendant's] intent was to ... kill [the victim]? There's no evidence of intent to kill [the victim], absolutely zero. There's no evidence of how [the defendant] acted where you could reasonably form an opinion in regard to... intent. There's no evidence of specific intent."
[21] We acknowledge that it would have been preferable for the prosecutor to have refrained from making any statement that could imply that an acquittal would "[reward]" the defendant for the destruction of evidence that would have more directly proven his guilt. We nevertheless are satisfied that the prosecutor's comments in this case, when viewed in contextspecifically in conjunction with his several statements that the evidence left behind was itself sufficient to establish the defendant's intent to kill the victim beyond a reasonable doubtcreated no real possibility that the jury would misunderstand the state's burden of proving the defendant's intent to kill the victim beyond a reasonable doubt.