******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

KENNETH J. OTTO, SR. *v.* COMMISSIONER
OF CORRECTION
(AC 36376)

Gruendel, Beach and Borden, Js.

*Argued September 15—officially released November 10, 2015*

(Appeal from Superior Court, judicial district of
Tolland, Sferrazza, J.)

*David J. Reich*, for the appellant (petitioner).

*Timothy J. Sugrue*, assistant state's attorney, with
whom, on the brief, were *Gail P. Hardy*, state's attor-
ney, and *Angela R. Macchiarulo* and *Kelly Masi*, senior
assistant state's attorneys, for the appellee
(respondent).

*Opinion*

GRUENDEL, J. The petitioner, Kenneth J. Otto, Sr., appeals from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. He claims that the court improperly concluded that he had not established that his trial counsel and his appellate counsel rendered ineffective assistance. We affirm the judgment of the habeas court.

This case involves the murder of an exotic dancer in 2007. As recounted by our Supreme Court in the petitioner's direct appeal, "[t]he victim, who was last seen on the afternoon of March 14, 2007, worked as a dancer at Kahoots, an exotic dance club located in Vernon, where the [petitioner] was a frequent patron up until the time that the victim disappeared. Beginning several weeks prior to the victim's disappearance, the [petitioner] and the victim initiated a personal relationship outside of her work at Kahoots. . . . On the afternoon of March 14, 2007, the victim left her parents' house, where she and her boyfriend lived, indicating to her boyfriend that she was going to work and meeting up with a client who owned a large parcel of property and drove a black truck. The victim did not show up for work that evening, nor did she return home that night, and no one from her family had any further contact with her after she left the house that afternoon.

"The victim's family, after becoming concerned about the lack of contact from her, filed a missing persons report with the East Hartford police department on March 16, 2007. Upon investigation of the missing persons report, the police identified the [petitioner] as an individual who potentially had information regarding the then missing victim, on the basis of a voice mail that the [petitioner] had left for the victim prior to her disappearance, and a telephone call that the [petitioner] had made to the victim's house telephone number after her disappearance. First, the victim's family discovered a voice mail on the victim's cell phone from 'Kenny' that was left on the morning of March 14, 2007, stating that the caller wanted to get together with the victim. Second, the [petitioner] had telephoned the victim's house telephone on March 17, 2007, and when the victim's mother answered, the [petitioner] said: 'Shamaia, call your mom and dad. They [are] worried about you.' He would not identify himself and hung up when the victim's mother asked who was calling, but the [petitioner] did identify himself when the victim's father returned the call to the number revealed by the caller identification feature on the house telephone. The [petitioner] also spontaneously, and without explanation, stated to the victim's father during this call that he had a physical problem that rendered him unable to be sexually active.

"The victim's family provided the police with the

information about these calls placed by the [petitioner], and Raymond Cheverier, an East Hartford police officer, followed up with the [petitioner] to see if he had any information about the then missing victim. After being informed that the victim had been reported missing, the [petitioner] told Cheverier that he had given the victim a ride to another Kahoots exotic dance club located in East Hartford around 4:30 p.m. on March 14, 2007, but had not seen her since, and that he was sick that evening and had stayed in bed for the next three days. The [petitioner] also stated that the victim had told him that she intended to stay with a female friend for a few days.

"On March 21, 2007, investigators from the East Hartford police department went to the [petitioner's] house and asked to speak with the [petitioner] . . . . Prior to leaving for the police station, unprompted by the investigators, the [petitioner] stated to Donald Olson, an investigator: 'It's sad . . . about Mya,' but did not elaborate further on that statement. During the subsequent interview at the police station, the [petitioner] gave the investigators an account of his personal relationship with the victim and his interactions with her on the night of March 14, 2007, which was memorialized in a sworn statement that eventually was read to the jury at trial. In that statement, the [petitioner] again indicated that he had picked up the victim in the afternoon of March 14, 2007, and had dropped her off at the Kahoots in East Hartford at her request, but denied any knowledge of what had happened to her after that time.

"On March 21, 2007, the police also discovered that the [petitioner] owned a seventy-five acre parcel of undeveloped land in Stafford (Stafford property). Thereafter, on March 23, 2007, the East Hartford police traveled to the Stafford property to search for the missing victim, during which time detectives entered the property and searched an unlocked camper/trailer (trailer) and the other unsecured areas they discovered on the property that were large enough to conceal a body. The police also conducted a helicopter flyover of the Stafford property at that time, during which they photographed the site and observed the trailer, two sheds, a fire pit, some tractors, and footprints and tire tracks in the snow that had fallen on March 16, 2007. The police did not find the victim on the property, but observed that the fire pit was not snow covered.

"Continuing their investigation, the police again sought to speak with the [petitioner] . . . on April 7, 2007 . . . . After engaging the [petitioner] in a casual conversation about his interactions with the victim, the officers suggested that they visit some of the places the [petitioner] had visited with the victim on March 9, 2007. The [petitioner] . . . informed the officers that, on March 9, 2007, the victim had expressed a desire to obtain her high school equivalency diploma and to

attend cosmetology school. The [petitioner] indicated that he had given the victim $500 on that date to help her attain this goal. He also informed the officers that he had discussed his erectile dysfunction with the victim on March 9, 2007, and that he was unable to perform sexually with her.

"Although the [petitioner] seemed to be forthcoming with information requested by the officers up to that point in the conversation, when the officers began asking the [petitioner] about his interactions with the victim on March 14, 2007, he became 'slightly agitated.' Additionally, when confronted with information concerning the victim's cell phone records, the [petitioner] acknowledged that he owned property in Stafford, but continued to maintain that he had never brought the victim there. The police then asked to perform a consent search of the truck the [petitioner] had used when driving the victim around, to which the [petitioner] agreed.

"The officers and the [petitioner] then returned to the [petitioner's] house, where the truck was located, performed the consent search of the truck, and found .40 caliber ammunition, .357 caliber ammunition and .38 caliber ammunition in a locked gun safe located between the two front seats. After completing the consent search of the truck, the officers discussed arrangements for a consent search of the [petitioner's] Stafford property . . . . On April 8, 2007, officers from the East Hartford police department, with the help of four teams of Connecticut state police cadaver dogs, executed a consent search of the Stafford property, during which two of the cadaver dog teams alerted on a large fire pit located in a large clearing on the property, exhibiting behavior indicating the presence of human remains. Shortly after the dogs alerted on the fire pit, the [petitioner] revoked his consent to continue the search, and both the East Hartford police and the state police officers left the Stafford property.

"On the basis of the results from the consent search on April 8, 2007, the East Hartford police sought and obtained search and seizure warrants for the [petitioner's] truck, which they executed on April 12, 2007, and his Stafford property, which they executed on April 16, 2007. The search of the . . . Stafford property, which began on April 16, 2007, lasted approximately four days and yielded numerous items of evidentiary value. First, when police arrived to execute the warrant, they found that the [petitioner] had dragged the trailer from the primary trailer site, where they had observed it during the April 8, 2007 consent search, down to the secondary site near the large fire pit, and that the living portion of the trailer had been ripped from the frame and burned. The police also observed the [petitioner] operating a backhoe, digging a hole in which he could bury the remains of the trailer. Furthermore, after excavating the dirt and ash from the large fire pit in the

secondary site, the police discovered several pieces of human tissue, numerous bone fragments and teeth, a portion of a human foot, a set of keys that were later determined to belong to the victim, two .40 caliber shell casings and a .38 Special caliber hollow point bullet. The police also recovered a third .40 caliber spent shell casing near, but not in, the large fire pit. The police continued the search of the property with the primary trailer site, from which they recovered an empty Cheetos bag, a Clorox Ready-Mop with traces of human blood on the handle and mop head, a six foot by two foot piece of carpet with a four foot by one foot human bloodstain (carpet piece), and a vacuum cleaner bag that contained several pieces of plastic and linoleum, both of which also had traces of human blood.

"On April 20, 2007, before the police had informed the [petitioner] that they had recovered the shell casings and the bullet from the large fire pit, the [petitioner's] attorney contacted Olson, asking him to come take the [petitioner's] guns for testing and safekeeping. Among the guns seized from the [petitioner's] locked gun safe were a .357 caliber revolver, a .38 Special caliber revolver and a .40 caliber semiautomatic pistol that had been disassembled and was missing its barrel when it was surrendered. When asked if he knew what had happened to the missing barrel, the [petitioner] told Olson that he had lost it.

"The items recovered from the . . . Stafford property and the guns were then submitted for forensic testing. The tissue samples, bone fragments and charred remains of the human foot taken from the large fire pit were all tested for DNA evidence and were confirmed as the remains of the victim. After conducting DNA analysis of the bloodstains from the mop and the pieces of plastic and linoleum found in the vacuum cleaner bag recovered from the primary trailer site, the forensic analysts were able to confirm that the blood on all of these items also had come from the victim. With regard to the bloodstain on the carpet piece, the forensic analysts were able to confirm that a four foot by one foot continuous section of it was stained with human blood, but because the carpet piece had been soaked by heavy rains prior to its recovery by police, the analysts were unable to generate a DNA profile from that, and were therefore unable to confirm that the blood on the carpet piece had come from the victim.

"Edward T. McDonough, deputy chief medical examiner for the state, testified that the remains recovered from the fire pit had a gasoline type odor. He also testified that nothing was found in the tissue sample during the toxicology screening, but based on the fact that the specimen submitted for testing had been exposed to high levels of heat, a negative test result did not conclusively establish that there were no drugs or alcohol in the victim's body at the time of her death.

McDonough further testified that, because of the fragmentary and burned condition of the remains, it was impossible to determine the cause or the manner of death.

"Albert Harper, a forensic anthropologist and director of the Henry C. Lee Institute of Forensic Science, testified that he was asked to examine the bone fragments recovered from the large fire pit as a consultant with the medical examiner's office. He indicated that the bones exhibited characteristics of having been burnt in 'a very hot fire.' He testified further that the level of cremation of the remains was close to that of commercial cremation, would have required '[l]ots of wood' and consistent temperatures of 1500 to 2000 degrees over the course of many hours, possibly spanning as many as several days. Although, like McDonough, Harper indicated that he could not determine whether there had been any trauma to the bones prior to the cremation because the fire process caused significant fragmentation of the bones, he was able to determine, based on the fact that the skin and a portion of the muscle tissue on the remains of the foot recovered were still intact, that the victim had been dead for approximately one month prior to the discovery of the remains.

"Beyond the scientific findings he made on the basis of his examination of the bone fragments that left him unable to point to any physical evidence to indicate that the victim had been the subject of a homicide, Harper, nevertheless, further testified that, in his experience, 'a body that has been deliberately cremated is indicative of someone wanting to make sure that that body is not found, and that would suggest that it's a homicide. . . . Based upon all the cases I've ever been associated with, when somebody tries to hide a body this way, it's because there was a homicide. There's a reason to hide it. . . . Someone went to a lot of trouble to dispose of this body.'

"Finally, with regard to ballistics evidence, Edward Jachimowicz, supervisor of the firearms and tool mark section of the state police forensics laboratory, testified that the bullet that had been recovered from the large fire pit was a .38 Special caliber bullet that could have been fired from either a .38 Special caliber revolver or a .357 caliber revolver, but that the bullet was too damaged to determine conclusively that it had been fired from either of the revolvers that the [petitioner] had surrendered. He further testified that, although the .40 caliber semiautomatic pistol the [petitioner] had surrendered was missing its barrel, and thus was not functional when surrendered, Jachimowicz was able to perform a test fire of the pistol using a replacement barrel from the state police reference collection. From this test fire, Jachimowicz was able to compare the breech face marks and the firing pin impressions along with the extractor marks on the test fired shell casings

to the .40 caliber shell casings found at the . . . Stafford property. On the basis of this comparison, Jachimowicz testified that it was his opinion that the three spent shell casings recovered from the Stafford property had been fired by the .40 caliber pistol that the [petitioner] had surrendered." (Footnotes omitted.) *State* v. *Otto*, 305 Conn. 51, 54–64, 43 A.3d 629 (2012).

On that evidence, the jury found the petitioner guilty of murder in violation of General Statutes § 53a-54a and two counts of tampering with evidence in violation of General Statutes § 53a-155 (a) (1). Id., 53. The trial court rendered judgment accordingly and sentenced the petitioner to a total effective term of sixty years incarceration. Id., 64. From that judgment, the petitioner appealed to our Supreme Court, claiming that (1) the evidence adduced at trial was insufficient to prove specific intent to commit murder and (2) certain statements made during the prosecutor's closing argument improperly shifted to the petitioner the burden of proof regarding his intent, thereby depriving him of a fair trial. Our Supreme Court rejected those claims and affirmed the judgment of conviction. Id., 81.

This habeas action followed. The petitioner's July 12, 2013 amended petition for a writ of habeas corpus contained two counts, alleging ineffective assistance of trial counsel and ineffective assistance of appellate counsel, respectively. Following a trial, the habeas court denied the petition. The court subsequently granted certification to appeal from that judgment to this court.

Before considering the specific claims presented by the petitioner, we first note the well established parameters of our review. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . . To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). . . . [F]or a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction . . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Citations omitted; internal quotation marks omitted.) *Mukhtaar* v. *Commissioner of Correction,* 158 Conn. App. 431, 437–38, 119 A.3d 607 (2015).

I

The petitioner first claims that the habeas court improperly concluded that he failed to sustain his burden of proof in demonstrating ineffective assistance of trial counsel. He contends that his trial counsel, Attorney Edward Gavin, rendered deficient performance in cross-examining Harper. More specifically, he argues that Gavin's line of questioning induced Harper to opine that the victim's death was the result of a homicide. We do not agree.

The following additional facts are relevant to this claim. At trial, the state introduced the testimony of the medical examiner, who testified that it was impossible to determine the cause or the manner of the victim's death. The state thereafter called Harper as an expert witness. Harper had visited the Stafford property and had examined the remains of the victim's body. In his trial testimony, Harper testified, inter alia, that an analysis of the bone fragments recovered from the fire pit on the Stafford property indicated that they likely had been burnt at temperatures of 1500 to 2000 degrees over the course of many hours, if not days. Harper also testified that the condition of those remains indicated that the victim had been dead for approximately one month prior to their discovery.

During cross-examination, Gavin questioned Harper on whether there was any evidence with respect to certain causes of death. The following colloquy transpired:

"[Gavin]: . . . And in regard to the examination of this specific evidence, Dr. Harper, were you able to make any determination whether or not the remains that you reviewed [indicated] that individual was subject to a gunshot?

"[Harper]: I saw nothing that would have suggested that there was a gunshot.

"[Gavin]: How about a stabbing?

"[Harper]: Nothing that would suggest that.

"[Gavin]: Okay. Now, how about a drug overdose?

"[Harper]: Absolutely no way I would ever know that.

"[Gavin]: Okay. How about a natural cause of death?

"[Harper]: Absolutely no way I would ever know that.

"[Gavin]: How about a suicide?

"[Harper]: No way that I could possibly tell that.

"[Gavin]: Sir . . . the analysis you conducted based on your radiographic studies, your microscopic studies, you were unable to determine whether or not there was a difference between the fracture sites that were caused as a result of heat versus fracture sites that were caused as a result of trauma. Is that correct?

"[Harper]: Given the enormous amount of destruction of the skeleton, and this is almost the equivalent of a commercial cremation, the fact that we could identify anything at all I thought was pretty remarkable, let alone seeing trauma, because the pieces are simply fragmented so totally.

"[Gavin]: Hundreds of very small little tiny pieces.

"[Harper]: Hundreds of little pieces.

"[Gavin]: And, doctor, I take it, then, you would not be able to opine as to the cause of death of [the victim].

"[Harper]: No.

"[Gavin]: Okay. And you wouldn't be able to opine in regard to the manner of [her] death.

"[Harper]: Not based upon the physical remains, no.

"[Gavin]: Or even the location of her death. I know the remains were recovered—

"[Harper]: Yes. Yes, I can offer an opinion.

"[Gavin]: Okay.

"[Harper]: Based upon my experience that a body that has been deliberately cremated is indicative of someone wanting to make sure that [the] body is not found, and that would suggest that it's a homicide."

The petitioner now contends that his counsel rendered deficient performance by "induc[ing]" that latter response. His claim is unavailing, as Gavin testified during the habeas trial that he asked the foregoing questions mindful that the medical examiner already had testified that it was impossible to determine the cause or manner of the victim's death. For that reason, Gavin indicated that he "was trying to track with [Harper] what the testimony was from the medical examiner in regard to the autopsy report."[1] Gavin testified that he "was incredulous" when Harper offered his opinion as to the manner of the victim's death. As he explained, "I didn't think there was a basis for that opinion because it flew in the face of the testimony of the medical examiner. [Harper's] a forensic anthropologist; he's not a medical examiner. And I just thought his opinion was just way out of his area of expertise."

In its memorandum of decision, the court specifically credited that testimony, finding that "[b]ecause the medical examiner had eliminated the possibility of ascertaining the method of demise from [the victim's] remains, [Gavin] understandably thought that Harper

would echo that opinion . . . ." It is axiomatic that, as an appellate court, we do not reevaluate the credibility of testimony. "The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Internal quotation marks omitted.) *Joseph* v. *Commissioner of Correction*, 117 Conn. App. 431, 433, 979 A.2d 568, cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009). We therefore refuse to disturb that credibility determination. On our review of the colloquy between Gavin and Harper, we concur with the court's conclusion that Harper's opinion testimony as to the manner of death was an unexpected departure from the testimonial and documentary evidence submitted earlier by the medical examiner.

Moreover, Gavin immediately challenged Harper's opinion testimony regarding the manner of death. Gavin elicited testimony from Harper indicating that his opinion was a personal one, rather than one that was based on a reasonable degree of medical certainty, and that "[t]here's no way of telling" if the death occurred where the remains were found. Under questioning from Gavin, Harper also conceded that he was unable to point to any physical evidence indicating that the manner of death was a homicide. In light of the foregoing, we cannot conclude that the petitioner's trial counsel rendered deficient performance during the cross-examination of Harper.

II

The petitioner also contests the court's conclusion that he failed to demonstrate ineffective assistance of appellate counsel. The petitioner claims that his appellate counsel, Adele V. Patterson, was deficient in failing to challenge the denial of his motion to suppress. We disagree.

Prior to trial, the petitioner filed a motion to suppress related to the warrantless search of the Stafford property on March 23, 2007. During the suppression hearing, the petitioner conceded that no physical evidence was obtained as result of that search. Instead, he sought to suppress photographs and observations made by the police at that time.[2] The court subsequently denied the substance of that motion, concluding, inter alia, that the search was justified under the emergency doctrine.[3] The court nevertheless suppressed the photographs taken by police, ruling that they were beyond the scope of the emergency search of the property.

At the habeas trial, Patterson explained her decision not to challenge that determination on appeal. She testified that she initially considered challenging the denial of the motion to suppress and conducted legal research thereon. Patterson ultimately made the strategic decision not to pursue such a claim on appeal for multiple reasons. First, she considered it to be "a pretty big

longshot of a suppression issue," as it was "pretty reasonable" to conclude that the emergency doctrine applied.[4] Second, Patterson "did additional analysis with respect to what [the police] located on the property at that point in time and whether . . . it was worth it to make that claim because what they found at that time was pretty minimal . . . ." Third, Patterson emphasized that "the most incriminating evidence in the case" was obtained during a subsequent search of the property conducted pursuant to a valid warrant.

As the court noted in its memorandum of decision, the petitioner at the habeas trial produced no expert testimony critical of Patterson's strategic decision. In rejecting the petitioner's claim of ineffective assistance, the court reasoned that Patterson's "research and review of the record demonstrated that the trial court's decision to admit the evidence derived from that search was factually supported and legally unassailable. She made the tactical decision to omit this weak issue because success was improbable, it would detract from stronger issues, and the evidence obtained by that search played a very small part in the state's case against the petitioner."

On appeal, the petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound [appellate] strategy." (Internal quotation marks omitted.) *Mukhtaar* v. *Commissioner of Correction*, supra, 158 Conn. App. 438; see also *Alterisi* v. *Commissioner of Correction*, 145 Conn. App. 218, 227, 77 A.3d 748 (tactical decision of appellate counsel not to raise particular claim ordinarily matter of appellate tactics and not evidence of incompetency), cert. denied, 310 Conn. 933, 78 A.3d 859 (2013). The petitioner has not done so. On the facts of this case, in which (1) the victim recently had been reported missing, (2) she had informed her boyfriend on the date of her disappearance that "she was going to work and meeting up with a client who owned a large parcel of property and drove a black truck"; *State* v. *Otto*, supra, 305 Conn. 54; and (3) the petitioner had provided the police with a sworn statement indicating that he had been with the victim on that date, Patterson reasonably could conclude that a challenge to the application of the emergency doctrine to enter the petitioner's seventy-five acre parcel would be unsuccessful. Perhaps more significantly, none of the highly incriminating evidence of the petitioner's guilt was obtained as a result of the March 23, 2007 search. For those reasons, we, like the habeas court, decline to second-guess Patterson's tactical decision not to pursue a challenge to the denial of the petitioner's motion to suppress. See *Watson* v. *Commissioner of Correction*, 111 Conn. App. 160, 169, 958 A.2d 782 ("a habeas court will not, with the benefit of hindsight, second-guess the tactical decisions of appellate counsel"), cert. denied, 290 Conn. 901, 962 A.2d 128 (2008). Accordingly, the petitioner's ineffective

assistance of appellate counsel claim fails.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Gavin also testified that the autopsy report "was incredibly favorable to [the petitioner] because the autopsy report could not describe the cause of death, could not describe the manner of death, could not describe the time of death."

[2] As the petitioner's trial counsel indicated to the court, "I'm certainly not going to try to create something magical to say that there was a ton of evidence seized that day. . . . Your Honor, there wasn't anything seized that I'm aware of. . . . There were photographs taken and observations made, and that's what we're challenging."

[3] "The emergency doctrine . . . is rooted in the caretaking function of the police. The purpose of the emergency doctrine is to allow the police to make a warrantless entry to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance. . . . The police must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat." (Citations omitted; internal quotation marks omitted.) *State* v. *Kendrick*, 314 Conn. 212, 230, 100 A.3d 821 (2014).

[4] With respect to the emergency doctrine, Patterson emphasized that, at the time of the March 23, 2007 search, "the police were still within a pretty short time of this person having been reported missing," and that they "thought that she might still be alive [and] had information at that point . . . that [the petitioner] had been with her."