## STATE OF CONNECTICUT *v.* FITZROY HUNTER
### (AC 27169)

Flynn, C. J., and McLachlan and Gruendel, Js.

Argued December 5, 2006—officially released March 6, 2007

*Aaron J. Romano*, with whom, on the brief, was *Cynthia M. Fernandez-Romano*, for the appellant (defendant).

*Sarah Hanna*, special deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Elizabeth Moseley*, special deputy assistant state's attorney, for the appellee (state).

### Opinion

McLACHLAN, J. The defendant, Fitzroy Hunter, appeals from the judgment of conviction, rendered after a trial to the court, of assault in the third degree in violation of General Statutes § 53a-61 and disorderly conduct in violation of General Statutes § 53a-182. On appeal, the defendant claims that (1) the court improperly declined to consider evidence of criminal convictions of the victim in making credibility determinations and (2) the state failed to adduce evidence sufficient to disprove that the defendant was acting in self-defense. We affirm the judgment of the trial court.

From the evidence presented at trial, the court reasonably could have found the following facts. On the evening of July 19, 2005, the defendant, who was employed as a maintenance person by a realty company,

arrived at the Hartford apartment of a tenant and complaining witness, Justin Wakefield, to fix a kitchen countertop and a leaky sink. The defendant had been working on the countertop the previous evening and had returned to finish the job. When the defendant arrived at the home, Wakefield was present along with Wakefield's wife, Shawanda Lattimore, and their six year old daughter.

According to Wakefield's testimony, when the defendant arrived, he proceeded directly to the kitchen, threw his bag down and began to complain about his employer, the realty company. He also began using profanity in front of Wakefield and his family. Around this time, Wakefield began conversing with his wife nearby, complaining about the difficulty they had in getting repairs completed in their apartment. The defendant, apparently taking offense to Wakefield's comments, interjected in their conversation and began to speak more loudly. A verbal confrontation ensued between the defendant and Wakefield, which culminated in Wakefield's asking the defendant to leave the apartment. Wakefield then walked up to the defendant, who jumped up from under the countertop with a red pipe wrench in his hand. Wakefield grabbed the defendant's arm and the verbal altercation turned physical.

Wakefield testified that he wrestled the pipe wrench from the defendant during the skirmish. At this point, the defendant grabbed a knife from the counter, told Wakefield to get away from him and began thrusting the knife. Wakefield testified that he became concerned because his wife and daughter were present, so he grabbed the defendant again and a further tussle ensued. During the melee, Wakefield's wife ran into another room and telephoned the police.

At some point, Wakefield managed to get the knife away from the defendant and restrained him. As Wakefield was holding the defendant in what he described

as "almost like a sleeper hold," the defendant bit him on the forearm. Wakefield then subdued the defendant on the floor with a knee on the defendant's back and his feet on the defendant's legs while the defendant's hands were behind his back. While restraining the defendant in this manner, Wakefield struck him, which apparently knocked out the defendant's tooth. During this time, the defendant was screaming at Wakefield to let him go and screaming, "help me" and "murder." The police arrived shortly thereafter and arrested the defendant.

Wakefield's wife, Lattimore, also testified regarding her observations of the incident. Although her account was similar to her husband's account, there were some inconsistencies. Among other things, Lattimore described the knife and the way the defendant brandished the knife in a manner inconsistent with her husband's testimony.[1]

The state's final witness was Officer Eric Baumgarten of the Hartford police. Baumgarten testified that he was dispatched to the apartment and was the first officer to arrive on the scene. Baumgarten testified that when he arrived, he observed Wakefield on top of the defendant holding him down in the kitchen. He also testified that he observed a knife on the kitchen floor but that he did not collect the knife as evidence. Baumgarten testified that he observed a bite mark on Wakefield and that he arrested the defendant on the basis of the statements of Wakefield and Lattimore and his observation of the bite mark.

The defendant raised the issue of self-defense at trial. The defense was premised on the defendant's version

---

[1] Wakefield testified that the knife blade was probably about six to eight inches long and that the defendant had brandished the knife in his left hand. Lattimore testified that the knife blade was approximately four inches and that the defendant brandished the knife in his right hand.

of the incident, which, although not entirely dissimilar from the accounts of Wakefield and Lattimore, portrayed Wakefield as the aggressor. The defendant testified that after he arrived at the apartment and began working in the kitchen, Wakefield confronted him about the work he was performing, became angry with the realty company and the maintenance problems he had been having in the apartment and began using profanity. According to the defendant, Wakefield became irate and began repeating, "This is my 'f' house," and continued to criticize the quality of the defendant's work. The defendant testified that Wakefield approached him in the kitchen while he was down on one knee and jumped on him and held him down while he cried out for help. The defendant testified that during this time, Wakefield beat him all over his body, knocked out his tooth and told Lattimore, "Go get my gun, let me kill him." The defendant admitted biting Wakefield while being squeezed by him; however, the defendant denied having a red pipe wrench[2] or threatening Wakefield with a knife. The defendant testified that he never saw a knife.

In addition to their direct observations of the incident, Wakefield, Lattimore and the defendant each testified about the tumultuous history between the defendant and the couple in the months leading to the incident. This testimony included differing accounts of a business partnership between the defendant and Wakefield gone awry, of Wakefield's alleged drug use, his apparent theft or misuse of the defendant's van, which Wakefield admitted to having operated without a license, his misuse of the defendant's credit card, as well as allegations of inappropriate advances made by the defendant toward Lattimore, which she had reported to the realty company and that the defendant adamantly denied.[3]

---

[2] The defendant testified that he had a yellow crescent wrench with him.

[3] A second defense witness, Mark Sussman, from the realty company that employed the defendant, testified about the complaint lodged by Lattimore against the defendant related to his alleged inappropriate advances.

During his direct testimony, Wakefield admitted that he had two prior felony convictions for reckless endangerment and possession of narcotics. On cross-examination, Wakefield admitted to having a third conviction for conspiracy to commit larceny in the third degree and acknowledged that he may have more convictions. Also during cross-examination, Wakefield attempted to evade questioning by invoking the constitutional privilege against self-incrimination on more than one occasion when confronted with inconsistencies. Cross-examination further revealed a motive to prevaricate on the part of Wakefield and Lattimore, namely, their pending civil lawsuit against the realty company arising out of the incident and their delayed decision to seek medical treatment,[4] made only after they consulted with their civil attorney.

After reviewing the evidence presented at trial, the court noted that the case essentially came down to an issue of credibility. In assessing the credibility of the witnesses, the court, among other things, found that a specific part of the defendant's testimony—that he did not observe the knife in the kitchen—contradicted the testimony of Baumgarten, and the court discounted the defendant's testimony on that point. The court also discounted the defense theory that Wakefield and Lattimore embarked on a conspiracy to set up the defendant, credited the testimony of Wakefield and Lattimore over the defendant's testimony related to the incident involving the defendant's van and found that the defendant's demeanor was very excitable. Accordingly, the court concluded that on the basis of the totality of the evidence, the testimony of Wakefield and Lattimore was more credible. The court then determined that the state

[4] In addition to Wakefield's injury, Lattimore testified that she slipped and sprained her ankle while running to call the police. The defendant testified, however, that he observed Lattimore limping the previous day. These injuries ostensibly formed the basis of the civil action.

had satisfied the elements of each offense and rendered a finding of guilty on both charges. This appeal followed.

I

On appeal, the defendant first claims that the court improperly declined to consider evidence of Wakefield's criminal history in making credibility determinations. The defendant refers to the following remarks made by the court at the conclusion of the trial: "[Defense counsel] in his questioning of [Baumgarten] said, well, if you had someone with seventeen convictions, who had knowledge about the . . . criminal justice system, *which, I might add, was totally not admissible, so there was no objection, but, it was not admissible. I'm certainly not going to take that into account.* . . . There was evidence that there [were] seventeen prior convictions. But I understand what you are doing: fighting for your client. I guess somebody, some other judge might have been convinced of that. I was not." (Emphasis added.).

On the basis of these statements, the defendant argues that we must presume that the court declined to consider, in assessing Wakefield's credibility, evidence of his three prior felony convictions that were elicited during his testimony. The defendant further argues that Wakefield's prior criminal history was admissible and that the court's sua sponte determination with respect to its inadmissibility, after the close of evidence and without objection from the state at the time the evidence was proffered, was improper. The state counters that the court's concluding remarks merely indicated that the court was declining to consider as evidence, questions and arguments posited by counsel.

Resolution of the defendant's claim requires us to understand exactly what evidence the court ruled was inadmissible. The only testimony in the record that

appears to address this specific issue was presented during the recross-examination of Baumgarten, when defense counsel queried, "Officer, would it surprise you that an individual with seventeen (17) prior *arrests* over the last ten years would be screaming out, yelling for the police to come and help him?" To which the officer replied, "Yes." (Emphasis added.) Upon review of the record, it is possible that the court was referring to, as the state has argued, the mere question posed by defense counsel, in which case the court was stating appropriately that the question was not admissible as evidence for the court's consideration as the fact finder. See *State* v. *Duntz*, 223 Conn. 207, 236, 613 A.2d 224 (1992) ("[s]tatements or comments made by attorneys in the course of examination or argument are not facts in evidence, and may not properly be considered by the [fact finder]"). Equally possible, however, is that the court was making admissibility determinations with respect to some or all of Wakefield's criminal history, which would require us to analyze whether such a ruling was improper.[5]

"It is the appellant's burden to provide an adequate record for review. . . . It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision . . . [or] to clarify the legal basis of a ruling . . . . In the absence of any such attempts, we decline to review this issue." (Internal quotation marks omitted.) *State* v. *Harris*, 85 Conn. App. 637, 651, 858 A.2d 284, cert. denied, 272 Conn. 901, 863 A.2d 695 (2004); see also Practice Book §§ 60-5, 61-10, 66-5. Here, in the absence of an articulation, we are

---

[5] Even within this possibility, it is unclear from the record whether the court was referring to evidence of seventeen prior arrests, some prior convictions for which no adequate foundation had been laid or all of Wakefield's prior criminal history, including the three felony convictions about which Wakefield himself testified.

unable to discern either the basis of the trial court's conclusion or its scope from the record before us.[6] It is not the province of this court to speculate as to the factual and legal determinations made by the trial court. See *Stone-Krete Construction, Inc.* v. *Eder*, 280 Conn. 672, 685, 911 A.2d 300 (2006). We conclude, therefore, that the record is inadequate for review, and, because the defendant failed to attempt to clarify the court's ruling, we decline to review the issue.

## II

The defendant next claims that the state failed to adduce evidence sufficient to disprove that he was acting in self-defense. Within this claim, the defendant argues that the court improperly did not hold the state to its burden of proof with respect to the self-defense claim, thereby denying him due process. We disagree.

General Statutes § 53a-19 (a) provides in relevant part that "a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose . . . ." Pursuant to § 53a-19 (c), however, "a person is not justified in using physical force when . . . he is the initial aggressor . . . ." It has been said that the initial aggressor is "the person who acts first in such a manner that creates a reasonable belief in another person's mind that physical force is

---

[6] For example, during defense counsel's oral motion for a judgment of acquittal made at the conclusion of the state's case-in-chief, the court stated: "Seventeen. All the evidence . . . was, I think, two or three felony convictions. But bringing in the seventeen was very effective on your part." This statement appears to counter the defendant's assertion that we must presume that the court excluded from evidence testimony related to Wakefield's three prior felony convictions; however, the issue remains unclear in the record before us.

about to be used upon that other person. The first person to use physical force is not necessarily the initial aggressor." (Internal quotation marks omitted.) *State* v. *Pranckus*, 75 Conn. App. 80, 94–95, 815 A.2d 678 (discussing definition as "incompliance with our case law"), cert. denied, 263 Conn. 905, 819 A.2d 840 (2003); see also *State* v. *Ramos*, 261 Conn. 156, 166–67, 801 A.2d 788 (2002).

The standard of review applicable to evidentiary insufficiency claims involves a two part test. "[W]e first construe the evidence most favorably to upholding the defendant's conviction, then ask whether a jury, upon the facts so construed and the reasonable inferences that follow, could have found the elements of [the crime] proven beyond a reasonable doubt. . . . In conducting our review, we are mindful that the finding of facts, the gauging of witness credibility and the choosing among competing inferences are functions within the exclusive province of the [fact finder], and, therefore, we must afford those determinations great deference." (Internal quotation marks omitted.) *State* v. *Sanchez*, 84 Conn. App. 583, 587–88, 854 A.2d 778, cert. denied, 271 Conn. 929, 859 A.2d 585 (2004).

"Self-defense is raised by way of justification, and when such defense is asserted the state shall have the burden of disproving such defense beyond a reasonable doubt. . . . Whether the defense of the justified use of . . . force, properly raised at trial, has been disproved by the state is a question of fact for the [fact finder], to be determined from all the evidence in the case and the reasonable inferences drawn from that evidence. . . . As long as the evidence presented at trial was sufficient to allow the [fact finder] reasonably to conclude that the state had met its burden of persuasion, the verdict will be sustained." (Citations omitted; internal quotation marks omitted.) *State* v. *Smith*, 73 Conn.

App. 173, 183–84, 807 A.2d 500, cert. denied, 262 Conn. 923, 812 A.2d 865 (2002).

A review of the record discloses that the evidence presented during the defendant's trial was sufficient to support the court's finding beyond a reasonable doubt that he was not acting in self-defense when he bit Wakefield. At the outset, we agree with the court that this case boils down to an issue of credibility. "Where testimony is conflicting the trier may choose to believe one version over the other . . . as the probative force of the evidence is for the trier to determine." (Internal quotation marks omitted.) *State* v. *Santiago*, 245 Conn. 301, 318, 715 A.2d 1 (1998).

Although the totality of the inconsistencies between Wakefield and Lattimore, their motive to prevaricate, Wakefield's cagey behavior on the witness stand and his prior criminal record appear to cast considerable doubt on the credibility of their version of the events that transpired, it is not the province of this court to assess witness credibility. There was evidence before the court to support the court's factual conclusion that the defendant first came at Wakefield with a wrench, placing Wakefield in fear of bodily harm, and that after a struggle ensued, the defendant picked up a knife and thrust it at Wakefield and subsequently bit Wakefield's arm during the struggle.

The court, by determining that the defendant came at Wakefield with the wrench, made the factual determination that the defendant was the initial aggressor and properly held the state to its burden of proof with respect to the defendant's justification claim. On the basis of the evidence and the inferences that reasonably might be drawn from it, we conclude that the state presented sufficient evidence to disprove the defendant's claim of self-defense beyond a reasonable doubt.

The judgment is affirmed.

In this opinion the other judges concurred.