******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MARY J. AMES
(AC 38397)

Beach, Prescott and Mullins, Js.*

*Argued September 22, 2016—officially released March 14, 2017*

(Appeal from Superior Court, judicial district of New Haven, Blue, J.; O'Keefe, J.; Keegan, J.)

*Emily H. Wagner*, assistant public defender, with whom were *Lauren Weisfeld*, chief of legal services, and *Timothy H. Everett*, assigned counsel, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, former state's attorney, and *Michael A. Pepper*, senior assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, J. The defendant, Mary J. Ames, appeals from the judgment of conviction, rendered after a trial before a three judge court, of murder in violation of General Statutes § 53a-54a. On appeal, the defendant claims that the court improperly (1) concluded that she failed to prove her affirmative defense of extreme emotional disturbance by a fair preponderance of the evidence, (2) concluded that the state had disproven her self-defense claim beyond a reasonable doubt, (3) concluded that the state had established that she possessed the specific intent to cause the victim's death beyond a reasonable doubt, and (4) interrupted and questioned counsel during the parties' closing arguments in violation of her right to the assistance of counsel. We affirm the judgment of the court.

After a trial, the court found the following facts. "At approximately 12:56 a.m., on May 24, 2010, at Doran's Bar, located at 80 Old Broadway in North Haven, [the victim] Christopher Hall, a bartender employed by the bar, died of a stab wound to the heart. The fatal wound was inflicted by a knife with a blade approximately three and one-half inches in length. The knife was wielded by [the defendant].

"The bar contains two rooms significant to this case, a poolroom and a barroom. Five people were in these rooms at the time of the stabbing, [the victim], [the defendant], [the defendant's] adult son, Michael Ames, Nicholas Moalli, a customer of the bar, and Joseph Iezzi, a friend of [the victim's] who had recently arrived to drive him home at the end of the shift. Of these five people, at least three, [the victim], [the defendant], and Iezzi, had been drinking heavily, and the remaining two, Moalli and Michael Ames, had been drinking at least moderately. It is safe to assume that alcohol played at least some role in the tragedy that happened. . . .

"[The victim] was working the night shift at the bar and was the sole employee on the premises. At approximately 11:15 p.m. on May 23, 2010, the defendant and her son arrived at the bar. They had already been drinking heavily and began to drink more at the bar. Moalli arrived at approximately 11:30, and the four occupants of the bar proceeded . . . to drink beer and shots.

"At approximately midnight, the four occupants moved from the barroom into the poolroom to play pool. Two teams were formed. [The defendant] and [the victim] formed one team, and Michael Ames and Moalli formed the other. The defendant believed that a wager was made. In her mind, the members of the losing team in two of three games would buy shots for each member of the winning team.

"The team of Michael Ames and Moalli won the first two games. Iezzi arrived shortly before the end of the match. Iezzi and Moalli stayed in the poolroom. [The

victim] returned to the barroom followed by [the defendant] and Michael Ames. Although [the defendant] had been a member of the losing team, she was determined to claim the proceeds of the bet for her son. She specifically was determined to pour a shot of tequila. [The victim] resisted.

"Autopsy findings established that [the victim] was punched in the face and kicked in the groin. The totality of all the evidence persuades us that both [the defendant] and Michael Ames took part in this assault.

"[The defendant's] statement to the police and her testimony to the court establish that during the struggle, she initially hit [the victim] in the chest with a sheathed knife that she carried in a pocketbook. She then removed the sheath and inflicted several wounds on [the victim]. Some of these were defensive wounds to [the victim's] hands and wrist. The fatal wound was a stab to the heart. All of these wounds were consistent with the knife . . . seized from the bar. The nature of these wounds convinces us that [the defendant] had the specific intent to kill [the victim] when she inflicted the fatal blow."

On the basis of the foregoing conduct, the state charged the defendant with (1) murder in violation of § 53a-54a, (2) felony murder in violation of General Statutes § 53a-54c, and (3) attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-134 (a) (2). The case was tried before a three judge court, which consisted of *Blue*, *O'Keefe*, and *Keegan*, *Js*. At trial, the defendant presented a claim of self-defense pursuant to General Statutes § 53a-19.[1] In the alternative, the defendant also presented the affirmative defense of extreme emotional disturbance pursuant to § 53a-54a (a).[2] The court found the defendant guilty of murder, but not guilty of felony murder and attempt to commit robbery. The court rejected both the defendant's claim of self-defense and her defense of extreme emotional disturbance.

After the judgment, the defendant filed motions wherein she requested that the court vacate its finding of guilty of murder and instead render judgment of guilty of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (2) or (3), or, in the alternative, render judgment of acquittal.[3] The court denied those motions and sentenced the defendant to a period of thirty-five years of incarceration followed by ten years of special parole. This appeal followed. Additional facts will be provided as necessary.

I

EXTREME EMOTIONAL DISTURBANCE

The defendant's first claim is that the court erroneously concluded that she failed to prove her affirmative defense of extreme emotional disturbance by a fair preponderance of the evidence. In particular, she

asserts that "the record in this case is devoid of 'ample evidence' contradicting the claim." The state responds that the defendant failed to carry her burden of proving that she killed the victim under the influence of an extreme emotional disturbance. We agree with the state.

We first set forth the relevant law and our standard of review. Section 53a-54a (a) provides in relevant part: "[I]n any prosecution [for murder], it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be.

"[E]xtreme emotional disturbance is a mitigating circumstance which will reduce the crime of murder to manslaughter. . . . Pursuant to General Statutes § 53a-12 (b), [w]hen a defense declared to be an affirmative defense is raised at trial, the defendant shall have the burden of establishing such defense by a preponderance of the evidence. . . . A homicide influenced by an extreme emotional disturbance . . . is not one which is necessarily committed in the hot blood stage, but rather one that was brought about by a significant mental trauma that caused the defendant to brood for a long period of time and then react violently, seemingly without provocation." (Internal quotation marks omitted.) *State* v. *Cannon*, 165 Conn. App. 324, 333–34, 138 A.3d 1139, cert. denied, 321 Conn. 924, 138 A.3d 285 (2016).

Our Supreme Court has observed that § 53a-54a "describes the two elements of that defense as: (1) the defendant committed the offense under the influence of extreme emotional disturbance; and (2) there was a reasonable explanation or excuse for the defendant's extreme emotional disturbance." *State* v. *Forrest*, 216 Conn. 139, 148, 578 A.2d 1066 (1990).

The first element requires the defendant to make three subsidiary factual showings: "[T]he defendant must persuade the trier of fact that . . . (1) the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the penal code; (2) the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and (3) the defendant had an extreme emotional reaction to *it*, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feeling, such as passion, anger, distress, grief, excessive agitation or other similar emotions." (Emphasis added; internal quotation marks omitted.) *State* v. *Crespo*, 246 Conn. 665, 677, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999). "Consideration is given

to whether the intensity of these feelings was such that his usual intellectual controls failed and the normal rational thinking for that individual no longer prevailed at the time of the act. . . . [T]he term extreme refers to the greatest degree of intensity away from the norm for that individual." (Internal quotation marks omitted.) *State* v. *Ruben T.*, 104 Conn. App. 780, 786, 936 A.2d 270 (2007), cert. denied, 285 Conn. 917, 943 A.2d 476 (2008).

"The determination of the presence or absence of extreme emotional disturbance is one of fact for the trier, and our review is the same whether the trier of fact is a judge, a panel of judges or a jury." *State* v. *Blades*, 225 Conn. 609, 628, 626 A.2d 273 (1993).

Accordingly, "[t]his court will construe the evidence in the light most favorable to sustaining the trial court's [finding of guilt] and will affirm the conclusion of the trier of fact [regarding the affirmative defense of extreme emotional disturbance] if it is reasonably supported by the evidence and the logical inferences drawn therefrom." *State* v. *D'Antuono*, 186 Conn. 414, 421, 441 A.2d 846 (1982).[4] In the present case, the court rejected the defendant's affirmative defense of extreme emotional disturbance, ruling: "After a careful consideration, we cannot conclude that the credible evidence supports this affirmative defense. Even if we were to hypothetically conclude that the defendant was exposed to extremely unusual and overwhelming stress, we cannot find that she had an extreme emotional reaction to *that* stress. While the evidence suggests that there was indeed stress in her personal life, we cannot find that her quarrel with [the victim], and her eventual killing of him, was a reaction to *that* stress. [The victim] had nothing to do with *that* personal stress. The killing was, rather, the result of a barroom brawl which the defendant herself had initiated." (Emphasis added.)

After reviewing the record and construing the evidence in the light most favorable to sustaining the court's finding of guilt, we conclude that the court's rejection of the defendant's affirmative defense of extreme emotional disturbance was reasonably supported by the evidence and the logical inferences drawn therefrom.

To establish the defense that she acted under the influence of an extreme emotional disturbance, the defendant relied on her own testimony and the testimony of Catherine F. Lewis, an expert in forensic psychiatry. During her testimony, the defendant admitted to killing the victim, but she claimed that she had done so under the influence of an extreme emotional disturbance. She contended that her extreme emotional disturbance had two sources: (1) the altercation with the victim, and (2) several unrelated stressful circumstances in her life.

Regarding the altercation with the victim, the defendant testified to the following. The defendant believed that she and the victim had made a wager in which the losers of the pool match would buy drinks for the winners. When the match concluded, the defendant and the victim began to argue over whether the victim, having lost the match, would buy the defendant's son a drink. As the victim left the poolroom to return to the barroom, the defendant followed him and continued arguing with him. The victim repeatedly refused to buy the defendant's son a drink. The argument continued as the victim and the defendant exchanged profanities, and, according to the defendant, the victim eventually "put his hands on [the defendant's] throat." The defendant testified that, when the victim touched her, it caused her to feel "terrified," "trapped," and "like [she] was going to be hurt." She claimed that these feelings were largely due to prior unrelated incidents in which she allegedly was assaulted and raped. As a result of those incidents, the defendant claimed to have started carrying a knife in her pocketbook for self-protection. Because the victim's touching of her made her feel "scared," "upset," and "[like] a mess," she "freaked out," retrieved the knife from her pocketbook, and stabbed the victim in an effort to "get away."

Regarding the other unrelated stressors in the defendant's life that contributed to her extreme emotional disturbance, she asserted that those included the following: (1) caring for her ill mother and managing her mother's finances, (2) losing her job, (3) ending a relationship with her boyfriend, and (4) relapsing into alcohol abuse after years of sobriety.

The defendant also presented the testimony of Lewis to support her extreme emotional disturbance defense. Lewis, an expert in forensic psychiatry, testified that after interviewing the defendant and reviewing the defendant's background and psychiatric history, she diagnosed the defendant with chronic post-traumatic stress disorder. Lewis opined that the defendant's stress disorder primarily was caused by two incidents in which the defendant claimed she previously had been assaulted and raped.[5] Furthermore, Lewis testified that a person suffering from this type of stress disorder is in a "perpetual state of hyperarousal" and responds to a threat in a manner "way out of proportion to what it should be." As a result, Lewis opined, if the defendant "truly believes she is at risk [physically], she would be at risk to respond with extreme force or whatever force it took to stop that risk from happening to her."

Regarding the defendant's altercation with the victim, Lewis agreed with defense counsel that the defendant told her that the victim "had his hands physically touching her in some way." As a result of this physical contact, the defendant told Lewis, she felt "trapped" and that she stabbed the victim only because she believed that

she had "to get him off me."

On the basis of the defendant's account of her altercation with the victim, Lewis, in offering the following opinion, agreed with defense counsel that (1) the defendant "was exposed to an extremely unusual and overwhelming stress" at the "time of [the] physical altercation"; (2) the defendant had "an extreme emotional reaction to the physical struggle between her and [the victim]"; and (3) the defendant's "ability to reason and act rational[ly] was overborne by intense feelings."[6] The defendant's stress disorder, according to Lewis, was an "important factor" in concluding that the defendant had acted under the influence of an extreme emotional disturbance.

The state did not call its own expert witness. Instead, it sought to impeach Lewis' testimony on cross-examination by undermining both her stress disorder diagnosis and her opinion that the defendant acted under the influence of an extreme emotional disturbance. In particular, the state successfully elicited that Lewis had not sought and obtained collateral evidence concerning some of the defendant's background and psychiatric and medical history.

The state also undertook a lengthy examination of how the defendant related the details of the altercation to Lewis. For instance, Lewis recalled that although the defendant claimed the victim "grabbed her by the throat," Lewis did not ask the defendant to demonstrate exactly how the victim grabbed her. Furthermore, Lewis had "trouble understanding" how and where on the defendant's person the victim grabbed the defendant: "I remember . . . that [the victim] was not throttling her, and it wasn't clear to me, even in talking to her for some time . . . ." "[W]hen she was describing him putting his hands on her . . . I could not elicit if it was throat or more . . . shoulder."

Lewis also indicated that the defendant provided her with two different accounts of how the altercation occurred. In the first version, the defendant claimed that the victim "reached across a bar" and "grabbed her by the throat," and, in the second version, the victim supposedly grabbed the defendant after the defendant had followed the victim behind the bar. Lewis acknowledged that she was aware of a third version that the defendant provided to the police, in which the defendant indicated that she lunged across the bar at the victim, struck him, tackled him, and stabbed him.

As reflected in both the defendant's testimony and the testimony of her expert, the defendant's claim of extreme emotional disturbance was largely premised on the crucial fact that her stress disorder was triggered when the victim grabbed her throat. The reasoning underlying the defendant's extreme emotional disturbance claim is as follows: (1) Lewis' expert testimony

established that the defendant had been suffering from a severe stress disorder, namely, post-traumatic stress disorder, at the time of the incident; (2) Lewis' testimony also established that the defendant's stress disorder, when triggered, could cause the defendant to react in a violent and extreme manner; (3) according to Lewis, the defendant's stress disorder could be triggered when she felt physically at risk; (4) on the basis of the defendant's assertion that the victim grabbed her throat, in Lewis' opinion, the victim's actions triggered the defendant's stress disorder; and (5) therefore, this triggering of the defendant's stress disorder compelled her to react in an extreme and violent manner, and to stab the defendant under the influence of an extreme emotional disturbance.

Importantly, however, the court did not make the factual finding that the victim grabbed the defendant's throat. Because this finding was a crucial factual premise upon which the defendant's extreme emotional disturbance defense was predicated, the defendant's failure to prove it was fatal to that affirmative defense. Absent the finding that the victim had grabbed the defendant by the throat, the defendant failed to establish any connection between her post-traumatic stress disorder and her stabbing of the victim. As a result, she failed to carry her burden in showing that she had an extreme emotional reaction to her "unusual and overwhelming state," which, the court hypothetically assumed, was her stress disorder. Thus, the court reasonably could have concluded that because the victim did not grab the defendant's throat, her stress disorder was not triggered and, therefore, that her stabbing of the victim simply was a reaction to "a barroom brawl [that] [she] herself had initiated," not a reaction to her stress disorder. Our review of the record reveals that there is ample evidence in the record to support this conclusion.

The defendant testified that she instigated an argument with the victim because he refused to buy her son a drink that she believed the victim owed him. The defendant decided that "[i]f [the victim] was not going to pour the drink for my son, I was going to pour the drink for my son." As the argument intensified, the defendant indicated in a statement to the police, she threatened the victim by telling him, "I'll kick you[r] son-of-a-bitchen ass . . . ." In that statement to the police, the defendant also disclosed that she eventually attacked the victim by lunging at him, tackling him, striking him, and stabbing him. Indeed, on the basis of this evidence, the court concluded that the defendant "pursued the victim into the barroom, threatened him, and lunged at him . . . [leaving] [the court] with no doubt that she was the initial aggressor."

Although the defendant argues that, in testifying at trial and talking to the police and to Lewis, she consis-

tently alleged that the defendant grabbed her throat, the court was free to disbelieve this self-serving testimony. "The trier of fact can disbelieve any or all of the evidence proffered concerning the defense of extreme emotional disturbance, including expert testimony, and can construe such evidence in a manner different from the defendant's assertions. . . . In a case tried before a court, the [panel] is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we will give the evidence the most favorable reasonable construction in support of the [trier of fact's finding of guilt] to which it is entitled." (Citations omitted; internal quotation marks omitted.) *State* v. *Ruben T.*, supra, 104 Conn. App. 788. Because the court noted that the "credible evidence [did not] support [the extreme emotional disturbance defense]," we must presume that the court simply did not believe the defendant's testimony that the victim had grabbed her throat. Indeed, the court's decision not to credit the defendant's testimony that the victim had grabbed her by the throat was supported by the testimony of two law enforcement officers, who indicated that they did not observe any visible signs of injury on the defendant's throat or on any other part of her body.[7]

Similarly, because Lewis' expert opinion was premised largely on the unproven subordinate fact that the victim grabbed the defendant's throat, the court also readily could have found her opinion unpersuasive. "The trier may accept or reject the evidence presented by the defendant and may choose to believe or disbelieve expert testimony, even when uncontroverted." *State* v. *Ricketts*, supra, 37 Conn. App. 755. "Despite the defendant's contention to the contrary, the trial court is not required to accept uncontradicted expert testimony. The court might reject it entirely as not worthy of belief or find that the opinion was based on subordinate facts that were not proven." *State* v. *Blades*, supra, 225 Conn. 629.

Accordingly, in construing the evidence in the light most favorable to sustaining the court's finding of guilt, we conclude that the court's determination that the defendant did not prove her affirmative defense of extreme emotional disturbance by a fair preponderance of the evidence was reasonably supported by the evidence and the logical inferences drawn therefrom.

## II

### SELF-DEFENSE

The defendant's second claim on appeal is that the court erroneously rejected her claim of self-defense. Specifically, the defendant argues that the court improperly concluded that she was the initial aggressor in the altercation with the victim and, therefore, that she was not justified in using physical force against the

victim. The state responds that it refuted the defendant's self-defense claim by establishing that the defendant was the initial aggressor. We agree with the state.

We first set forth our standard of review and the relevant law. "On appeal, the standard for reviewing sufficiency claims in conjunction with a justification offered by the defense is the same standard used when examining claims of insufficiency of the evidence. . . . In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the [trier of fact's finding of guilt]. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [fact finder] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the [fact finder] if there is sufficient evidence to support the [trier of fact's finding of guilt]. . . . Moreover, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [fact finder's determination of guilt]." (Citations omitted; internal quotation marks omitted.) *State* v. *Revels*, 313 Conn. 762, 778, 99 A.3d 1130 (2014), cert. denied,    U.S.    , 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015).

"Self-defense is raised by way of justification, and when such defense is asserted the state shall have the burden of disproving such defense beyond a reasonable doubt. . . . Whether the defense of the justified use of . . . force, properly raised at trial, has been disproved by the state is a question of fact for the [fact finder], to be determined from all the evidence in the case and the reasonable inferences drawn from that evidence. . . . As long as the evidence presented at trial was sufficient to allow the [fact finder] reasonably to conclude that the state had met its burden of persuasion, the [fact finder's determination of guilt] will be sustained." (Internal quotation marks omitted.) *State* v. *Hunter*, 99 Conn. App. 736, 745, 916 A.2d 63, cert. denied, 282 Conn. 925, 926 A.2d 667 (2007).

Section 53a-19 (a) provides in relevant part: "[A] person is justified in using reasonable physical force upon another person to defend himself . . . from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm."

Pursuant to § 53a-19 (c), however, "a person is not justified in using physical force when . . . he is the

initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force . . . .'' ''Therefore, if the [panel] found that the defendant was the aggressor in [her] encounter with the victim, [s]he could not prevail on [her] claim of self-defense.'' *State* v. *Jimenez*, 228 Conn. 335, 339–40, 636 A.2d 782 (1994).

Our Supreme Court has defined the term initial aggressor as ''the person who first acts in such a manner that creates a reasonable belief in another person's mind that physical force is about to be used [on] that other person . . . .'' (Internal quotation marks omitted.) *State* v. *Jones*, 320 Conn. 22, 53–54, 128 A.3d 431 (2015).

In the present case, the court rejected the defendant's self-defense claim, holding: ''The defendant claims that she was justified in using physical force against [the victim], pursuant to . . . § 53a-19. The evidence does not support this claim. On the contrary, the evidence that she pursued [the victim] into the barroom, threatened him, and lunged at him leaves us with no doubt that she was the initial aggressor. . . . There is no claim or evidence that having commenced this encounter she ever withdrew from it.'' (Citation omitted; internal quotation marks omitted.)

Our review of the record reveals that there was sufficient evidence to support the court's finding that the defendant was the initial aggressor in the altercation with the victim and, therefore, that she was not justified in using force against him. As set forth in part I of this opinion, the defendant indicated in her statement to the police and in her testimony at trial that she instigated an argument with the victim over a shot of tequila, pursued the victim as the argument escalated, threatened the victim, lunged at the victim, tackled the victim, struck the victim, and then stabbed the victim in the chest. Additionally, the court reasonably could have inferred from the lack of any signs of injury on the defendant's person, as well as the numerous defensive type wounds that the victim sustained,[8] that it was the victim who had been acting in self-defense, not the defendant. See, e.g., *State* v. *Riggsbee*, 112 Conn. App. 787, 795, 963 A.2d 1122 (2009) (trial court properly concluded that state disproved self-defense claim where police officers testified that they observed signs of injury on victim's person but not on defendant's person).

Accordingly, in construing the evidence in the light most favorable to sustaining the court's finding of guilt, we conclude that the court properly determined that the state proved beyond a reasonable doubt that the defendant did not act in self-defense.

## III
## SPECIFIC INTENT TO CAUSE DEATH

The defendant's third claim on appeal is that the court erroneously concluded that the state established beyond a reasonable doubt that the defendant possessed the specific intent to cause the death of the victim. In particular, the defendant argues that because she was intoxicated when she stabbed the victim, her intoxication prevented her from forming the specific intent to kill the victim. The state responds that there was ample circumstantial evidence in the record to support the court's conclusion that the defendant intended to cause the victim's death, notwithstanding the fact that the defendant may have been intoxicated. We agree with the state.

We first set forth the relevant law and our standard of review. "Under . . . § 53a-54a (a), the state must prove that the defendant acted with the specific intent to cause the death of the victim. . . . Intent is a mental process which ordinarily can be proven only by circumstantial evidence. An intent to cause death may be inferred from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . .

"Whether a criminal defendant possessed the specific intent to kill is a question for the trier of fact. . . . This court will not disturb the trier's determination if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Chace*, 199 Conn. 102, 104–105, 505 A.2d 712 (1986). "[I]n viewing evidence which could yield contrary inferences, the [fact finder] is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the [fact finder's] function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Francis*, 228 Conn. 118, 127, 635 A.2d 762 (1993).

A fact finder may infer intent to cause death from various types of circumstantial evidence: (1) "intent to kill may be inferred from evidence that the defendant had a motive to kill"; (internal quotation marks omitted) *State* v. *Otto*, 305 Conn. 51, 67, 43 A.3d 629 (2012); (2) "thrust[ing] [a] knife with great force and direct[ing] . . . blows to vital areas, indicat[es] that [the defendant] purposely sought to cause serious injury or

death"; *State* v. *Chace*, supra, 199 Conn. 106; (3) "if the defendant has caused a grievous wound that could cause the victim's death if not treated promptly, the failure to summon that treatment is consistent with an antecedent intent to cause death"; (internal quotation marks omitted) *State* v. *Otto*, supra, 71–72; and (4) "consciousness of guilt evidence [is] part of the evidence from which a [fact finder] may draw an inference of an intent to kill." (Internal quotation marks omitted.) Id., 73.

Our review of the record in the present case reveals that there was ample evidence presented at trial from which the court could have inferred that the defendant possessed the specific intent to cause the victim's death. First, the court could have found that the defendant had a motive to kill the victim. The defendant's testimony and statement to the police indicated that she instigated an argument with the victim over a shot of tequila that she believed the victim owed to her son. The defendant was determined to claim her son's drink, stating that "[i]f [the victim] was not going to pour the drink for my son, I was going to pour the drink for my son." In reaction to the victim's refusal to give the defendant's son a drink, the defendant told the victim, "I'll kick you[r] son-of-a-bitchen ass . . . ." Thereafter, some type of physical altercation ensued, in which the defendant lunged at, tackled, and struck the victim. The defendant concluded that because the victim was much taller than she is, she would have to lunge at him with her knife to overcome the size disadvantage.

Second, the court reasonably could have found that in "thrust[ing] [a] knife with great force and direct[ing] . . . blows to [the victim's] vital areas . . . [the defendant] purposely sought to cause serious injury or death." *State* v. *Chace*, supra, 199 Conn. 106. Indeed, our Supreme Court has noted that "[o]ne who uses a deadly weapon upon a vital part of another will be deemed to have intended the probable result of that act, and from such a circumstance a proper inference may be drawn in some cases that there was an intent to kill." (Internal quotation marks omitted.) *State* v. *Rasmussen*, 225 Conn. 55, 72, 621 A.2d 728 (1993). Given that the heart undoubtedly is a vital area, the testimony of a state medical examiner that the defendant stabbed the victim in the chest with enough force to puncture his skin, soft tissue, cartilage, and heart afforded the court a strong basis from which it could infer an intent to kill.

Additionally, the medical examiner testified that the victim also sustained, at the same time as the stabbing wound, defensive type wounds to his arms and wrists, and abrasions to his forehead, arms, lips, neck, legs, and penis. Such wounds suggest that the defendant intended to overcome the victim's resistance so that she could inflict a final and fatal blow.

Third, because "the defendant . . . caused a grievous wound that could [have] cause[d] the victim's death if not treated promptly, [her] failure to summon that treatment [was] consistent with an antecedent intent to cause death." (Internal quotation marks omitted.) *State* v. *Otto*, supra, 305 Conn. 71–72. The court could have found that after she had stabbed the victim, the defendant immediately fled the bar and did not attempt to render aid to the victim or summon medical assistance. Indeed, the defendant, and her son, Michael Ames, ran to her car, which was parked in Doran's parking lot, and Michael Ames drove them to the defendant's home.

Fourth, the state presented evidence that suggested that the defendant manifested a consciousness of guilt after the stabbing. The state's evidence showed that the defendant fled the bar after the stabbing and attempted to conceal the sheath of the knife somewhere in her home. See, e.g., *State* v. *Patterson*, 229 Conn. 328, 331, 641 A.2d 123 (1994) (jury could have inferred intent to cause death on basis of defendant's hiding murder weapon after crime by "wrapp[ing] [it] in an old pair of pants" and "hid[ing] [it] beneath the turntable of a stereo set in [his] bedroom"). Moreover, as the police arrived at the defendant's home, they observed from their cruisers that the defendant was walking from the garage of her home to the front door. When the defendant turned her head and looked at the police cruisers, she "quickened her pace" and entered the home through the front door. Although the defendant testified that she was unaware that the police were at her home, the responding officers testified that they had attempted to make contact with the defendant for approximately thirty minutes by calling her home telephone, banging on the front door, and yelling loudly. The defendant never responded to the officers, and the officers were able to enter the house and apprehend the defendant only after using a battering ram to knock down the front door.

Notwithstanding the foregoing, the defendant claims that she could not have formed the intent to kill the victim because she was intoxicated at the time of the stabbing. "Intoxication, as used in General Statutes § 53a-7, means a substantial disturbance of mental or physical capacities resulting from the introduction of substances into the body. . . . [Although] intoxication is neither a defense nor an affirmative defense to a murder charge in Connecticut, evidence of a defendant's intoxication is relevant to negate specific intent which is an essential element of the crime of murder. . . . Intoxication, however, does not automatically negate intent. . . . It is for the [fact finder] to decide, after weighing all the evidence adduced at trial, whether a criminal defendant's intoxication rendered him incapable of forming the intent required to commit the crime

with which he is charged." (Internal quotation marks omitted.) *State* v. *Rice*, 105 Conn. App. 103, 109, 936 A.2d 694 (2007), cert. denied, 285 Conn. 921, 943 A.2d 1101 (2008).

In asserting that she was too intoxicated to form the intent to kill the victim, the defendant relies mainly on her own testimony. Specifically, she cites the following particular claims as negating her intent to kill the victim: (1) her description of how she first struck the victim with the knife still sheathed and how she struggled to remove the sheath from the knife; (2) her confusion and inability to perfectly recall the events and the details of the stabbing; and (3) her conduct after the stabbing, in which she returned home, fell asleep, "fully cooperated with police," and was "remorseful." As we previously indicated in parts I and II of this opinion, however, the court was free to disbelieve part or all of the defendant's self-serving testimony. See, e.g., *State* v. *Fernandez*, 76 Conn. App. 183, 191, 818 A.2d 877 ("[A trier of fact] may believe or disbelieve all or any portion of the testimony offered. . . . A trier of fact is free to reject testimony even if it is uncontradicted . . . and is equally free to reject part of the testimony of a witness even if other parts have been found credible." [(Internal quotation marks omitted.]), cert. denied, 264 Conn. 901, 823 A.2d 1220 (2003).

We are mindful that the court did acknowledge that the defendant had been "drinking heavily" and that "alcohol played at least some role in the tragedy that happened." The court, however, in responding to the defendant's motion for articulation, asking, "[h]ow the evidence of the defendant's intoxication was considered as to whether she was capable of forming the intent to kill [the victim]," explained: "As [§ 53a-7] indicates, the *substantive* question for the fact finder in a murder case is not whether the defendant was intoxicated, but whether the state has proven all of the elements of the crime charged beyond a reasonable doubt. . . . The sole contested question is whether [the defendant] acted with intent to cause the death of another person. . . . [T]he court has found that such intent has been proven beyond a reasonable doubt. . . . [T]his finding has been made after a careful review of *all* the evidence in the case." (Emphasis in original; internal quotation marks omitted.)

Thus, we must conclude that the court, having considered all the evidence presented, simply did not believe that the defendant was so intoxicated that she could not form the specific intent to kill. We conclude that the court acted reasonably in so finding. To be sure, the court was presented with substantial evidence from which it could have inferred the defendant's intent to kill and from which it reasonably could have determined that her intoxication did not prevent her from forming the specific intent to kill the victim.

Accordingly, we conclude that the cumulative effect of all the evidence adduced at trial and the inferences reasonably drawn therefrom amply support the trial court's conclusion that the defendant was able to and did form the specific intent to kill the victim.

## IV

## COURT'S QUESTIONING OF COUNSEL DURING CLOSING ARGUMENT

The defendant's final claim is that she was deprived of her constitutional right to the assistance of counsel when the court interrupted defense counsel during closing argument.[9] Specifically, the defendant asserts that the court's questioning was improper because it "constituted presubmission deliberation" that "deprived the defendant of her right to have her counsel present her defense as she saw fit." The state responds that the defendant has failed to demonstrate that the court's questioning interfered with defense counsel's presentation of her closing argument. We agree with the state.

The following additional facts are relevant to our review of the defendant's claim. During the parties' closing arguments, the court interrupted both the prosecutor and defense counsel to ask counsel questions. In particular, the court asked counsel to explicate their theories regarding (1) a broken pool cue found in Doran's poolroom, which the court deemed "important" evidence,[10] (2) the cause and significance of the defensive type wounds that the victim sustained, (3) the possibility that the defendant's son, Michael Ames, inflicted some of the wounds sustained by the victim, (4) the precise location in Doran's where the defendant stabbed the victim, (5) whether the evidence indicated that the defendant intended to rob Doran's cash register, especially in light of testimony that suggested that the defendant had her hand in or near the cash register's drawer, and (6) whether the defendant's attempt to steal a shot of tequila could serve as the predicate felony for felony murder.[11]

The court also interrupted counsel, particularly defense counsel, to ask other clarifying questions. After defense counsel stated that "the issue here is not whether or not [the defendant] caused the death but, rather, what were the circumstances, what [was] her mental state," the court asked, "just to make it very clear, there's no question as to identity or causation[?]" Moreover, the court interrupted defense counsel at one point to clarify whether defense counsel was referring to Michael Ames or the defendant, and, at another point, it asked defense counsel to clarify the location in the bar to which she was referring. Last, when defense counsel stated that she was "not going to discuss the several alternative theories of how [she thought] that [the court's decision] should come out on the murder charge," the court asked defense counsel to clarify what

alternative theories the defense was presenting: "If, hypothetically, we find no intent, hypothetically. . . . It seems to me that you wish us to consider a lesser included offense. The appropriate lesser included offense if, hypothetically, we find no intent, would be [reckless manslaughter]. . . . Do you agree?" The court also asked if the defendant was seeking a "straight not guilty [finding]," if "the self-defense claim is only claimed if we find intent," and, "[i]f we hypothetically, and I mean hypothetically, do not find intent, then we don't consider self-defense . . . we go to reckless."

On appeal, the defendant claims that the foregoing interruptions by the court denied defense counsel the ability to present closing argument as she saw fit and, therefore, deprived the defendant of her right to the assistance of counsel. We disagree.

Although the defendant did not preserve this claim properly at trial by objecting to the court's interruptions and questions, she asks us to review the claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (modifying third condition of *Golding*). Even if we were to conclude that the first two *Golding* prongs are satisfied, the defendant's claim fails because it does not satisfy *Golding*'s third prong.

"As we recently have noted, [u]nder *Golding* review . . . a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . Because a defendant cannot prevail under *Golding* unless he meets each of those four conditions, an appellate court is free to reject a defendant's unpreserved claim upon determining that any one of those conditions has not been satisfied." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Cunningham*, 168 Conn. App. 519, 528–29, 146 A.3d 1029, cert. denied, 323 Conn. 938,     A.3d     (2016).

Regarding *Golding*'s first prong, the record is adequate for review because all of the court's interruptions and questioning occurred on the record during closing argument. Moreover, because the defendant alleges that the court violated her sixth amendment right to present a closing argument, her claim is, at least arguably, of constitutional magnitude, and, therefore, we assume that it satisfies *Golding*'s second prong. With respect to *Golding*'s third prong, however, the defendant's claim fails because the defendant has not shown that the court's interruptions and questioning violated her

right to present a closing argument.

"The sixth amendment guarantee in the federal constitution of the right to assistance of counsel has been held to include the right to present closing arguments. . . . The defendant enjoys the same right whether the trial is to a jury or to the bench. . . . If the trial court denies the defendant an opportunity to give closing arguments, the reviewing court should grant a new trial." (Citations omitted.) *State* v. *Plaskonka*, 22 Conn. App. 207, 210–11, 577 A.2d 729, cert. denied, 216 Conn. 812, 580 A.2d 65 (1990). "The right to present a closing argument is abridged not only when a defendant is completely denied an opportunity to argue before the court or the jury after all the evidence has been admitted, but also when a defendant is deprived of the opportunity to raise a significant issue that is reasonably inferable from the facts in evidence." *State* v. *Arline*, 223 Conn. 52, 64, 612 A.2d 755 (1992).

"Comments made by a trial judge during closing argument can only warrant reversal if it appears that the judge's conduct was clearly prejudicial to the rights of the party." (Internal quotation marks omitted.) *United States* v. *Simpson*, 337 F.3d 905, 908 (7th Cir. 2003), cert. denied, 540 U.S. 1128, 124 S. Ct. 1100, 157 L. Ed. 2d 930 (2004). "Only in rare circumstances will the court's interruptions of a defense counsel's closing argument call for a new trial." *United States* v. *Hammer*, 25 F. Supp. 2d 518, 533 (M.D. Pa. 1998), appeal dismissed, 226 F.3d 229 (3d Cir. 2000), cert. denied, 534 U.S. 831, 122 S. Ct. 75, 151 L. Ed. 2d 40 (2001).

Regarding a trial court's interference with closing argument, our courts have found reversible error only where the trial court affirmatively precluded defense counsel from discussing particular issues during closing argument. Compare *State* v. *Arline*, supra, 223 Conn. 64–65 (new trial required where trial court improperly precluded defense counsel from questioning credibility of complainant by referring to evidence of complainant's bias and motive), and *State* v. *Ross*, 18 Conn. App. 423, 433–34, 558 A.2d 1015 (1989) (defendant entitled to new trial where trial court prohibited defense counsel from commenting on fact that state's sole eyewitness did not testify at trial), with *State* v. *McArthur*, 96 Conn. App. 155, 174–75, 899 A.2d 691 (not error for trial court to preclude defense counsel from commenting on state's failure to call witness because defendant did not demonstrate that failure to call witness necessarily indicated weakness in state's case), cert. denied, 280 Conn. 908, 907 A.2d 93 (2006).

The principal flaw in the defendant's claim is that she has not identified any specific arguments or issues that defense counsel was prevented from presenting to the court. Indeed, a review of defense counsel's closing argument reveals that, notwithstanding the court's interruptions, defense counsel was able to present

robust argument regarding the evidence and theories of defense. In particular, defense counsel used the majority of her time during closing argument to challenge the felony murder and attempt to commit robbery charges. As indicated by the court's acquittal on those charges, defense counsel was successful in demonstrating that the state did not carry its burden of proof on those charges. Defense counsel also was able to present argument that the evidence presented at trial failed to show that the defendant intended to cause the victim's death. Furthermore, defense counsel later discussed the defendant's "mental state" and how Lewis' testimony, evidence of the defendant's intoxication, and other physical and testimonial evidence tended to support her claim of self-defense and the affirmative defense of extreme emotional disturbance.

Additionally, the defendant has not demonstrated that the court's particular questions and interruptions were so prejudicial that they deprived her of a fair trial. First, some of the court's questions were asked for purposes of clarifying defense counsel's argument. For instance, although defense counsel stated that she would not "discuss the alternative theories" presented by the defense, the court, presumably to prevent confusion, was able to elicit the defendant's position with respect to lesser included offenses, intent, and affirmative defenses. Second, the court asked the same questions of *both* parties, and when it asked the state a question that it had not asked defense counsel, defense counsel was given a chance to respond after the completion of closing arguments.[12] Third, although it initially had denied defense counsel's request for additional time, the court later granted defense counsel an additional five minutes for argument. Fourth, the court expressly rejected the defendant's contention that the questions were a form of "premature deliberation." As previously indicated, the court was careful to indicate that its questions were "hypothetical" in nature and that it was not yet making any actual findings.

Ultimately, the defendant's claim that the court's questions and interruptions were prejudicial is unpersuasive. Indeed, rather than view the court's conduct as prejudicial to the defendant, many advocates would view the court's questions as a welcome opportunity to learn and then address the fact finder's specific concerns with any weaknesses and flaws in their arguments. In the present case, this is precisely what the court's questions permitted defense counsel to do. Moreover, as previously discussed, such questions did not in any way preclude defense counsel from arguing the defendant's theories of defense. Therefore, we conclude that, rather than having a detrimental effect on the presentation of the defendant's case, the court's questions actually aided the defendant in her presentation.

On the basis of the foregoing, we conclude that the court's interruptions did not deny defense counsel the opportunity to present the defendant's theory of defense or otherwise prejudice the defendant. Accordingly, we conclude that the court's questioning of defense counsel did not deprive the defendant of her right to the assistance of counsel.[13] Therefore, the defendant's claim fails under the third prong of *Golding* because a constitutional violation did not occur.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] General Statutes § 53a-19 (a) provides in relevant part: "[A] person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm."

[2] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[3] Specifically, the defendant sought vacatur on the grounds that "the court did not apply the correct legal analysis as to extreme emotional disturbance" and that "the court erroneously found that the defendant did not establish [the affirmative defense of extreme emotional disturbance] by a preponderance of the evidence . . . ." The defendant sought an acquittal on the ground that "the evidence adduced at her trial did not reasonably permit a finding as to the element of intent to cause death . . . ." (Internal quotation marks omitted.)

[4] We note that there is a line of cases stating that we apply the abuse of discretion standard of review to the rejection of an extreme emotional disturbance defense in an appeal from a trial to the court. This line of cases originates with the Supreme Court's decision in *State* v. *Zdanis*, 182 Conn. 388, 391–92, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 207 (1981). In *Zdanis*, the court stated: "Although this case presents an unusual procedural posture where a three-judge panel serves as the finder of facts (instead of a jury) and where the burden is on the defendant to prove his affirmative defense, the normal rules for appellate review of factual determinations apply and the evidence must be given a construction most favorable to sustaining the court's verdict. . . . Moreover, the question is whether upon the facts established and the inferences drawn therefrom the fact-finder could have reasonably concluded that the cumulative effect of the evidence failed to establish that the defendant acted under the influence of an extreme emotional disturbance for which there was a reasonable explanation or excuse. In sum, *except where an abuse of discretion is clearly shown*, the conclusion of a trial court should be affirmed so long as it is a reasonable one on the basis of the evidence adduced and the inferences drawn therefrom." (Emphasis added.) Id.; see also, e.g., *State* v. *Crespo*, supra, 246 Conn. 677 (citing abuse of discretion standard); *State* v. *Cannon*, supra, 165 Conn. App. 335 (same); *State* v. *Ricketts*, 37 Conn. App. 749, 755–56, 659 A.2d 188 (same), cert. denied, 234 Conn. 913, 660 A.2d 355, cert. denied, 516 U.S. 977, 116 S. Ct. 481, 133 L. Ed. 2d 409 (1995).

We also note, however, that our jurisprudence is clear that we treat review of this type of claim in the same manner, regardless of whether it arises from a court trial or jury trial. *State* v. *Blades*, supra, 225 Conn. 628 ("[t]he

determination of the presence or absence of extreme emotional disturbance is one of fact for the trier, and our review is the *same* whether the trier of fact is a judge, a panel of judges or a jury" [emphasis added]).

Accordingly, we follow the line of authority that does not require review under the abuse of discretion standard. See *State* v. *DeJesus*, 236 Conn. 189, 203–204, 672 A.2d 488 (1996); *State* v. *Blades*, supra, 225 Conn. 628–30; *State* v. *Steiger*, 218 Conn. 349, 378–85, 590 A.2d 408 (1991); *State* v. *D'Antuono*, supra, 186 Conn. 420–22. Thus, we review the defendant's claim to ascertain whether upon the evidence presented at trial and the reasonable inferences drawn therefrom, the court reasonably could have concluded that the cumulative effect of the evidence failed to establish that the defendant acted under the influence of an extreme emotional disturbance.

[5] Lewis also addressed how other stressors in the defendant's life had exacerbated the defendant's stress disorder. Those stressors included: (1) having a genetic predisposition for alcohol dependency, (2) managing her ill mother's finances, (3) losing her job, (4) abusing alcohol for many years, and (5) ending a relationship with her boyfriend.

[6] In particular, Lewis stated that the defendant experienced intense feelings of "terror," "isolation," and "vulnerab[ility]." She testified that the defendant also felt "like trash," "like [she was] going to be killed or hurt," and "as helpless as a little eleven year old girl with, like, death bearing down on you."

[7] We note that, even if the court had credited the defendant's testimony that the victim grabbed her by the throat, it still could have concluded that she failed to prove her extreme emotional disturbance defense. We focus on the throat-grabbing because the defendant appears to emphasize that occurrence as support for her contention that her stress disorder was triggered and, therefore, that she necessarily acted under the influence of an extreme emotional disturbance. The court, however, could have found both that the victim grabbed the defendant *and* that the defendant's reaction to the grabbing was not done under the influence of an extreme emotional disturbance. The court still was not required to credit any of the other evidence that the defendant proffered in support of her contention that she acted under the influence of an extreme emotional disturbance, whether it was her own testimony or that of her expert witness. In other words, on the basis of all of the evidence presented, the court properly determined that the defendant had not met her burden of establishing her defense by a preponderance of the evidence. Indeed, as noted in part I of this opinion, the evidence clearly supported the court's conclusion that the stabbing simply was a reaction to "a barroom brawl [that] [she] herself had initiated," rather than a reaction that occurred under the influence of an extreme emotional disturbance.

[8] A state medical examiner testified that the victim sustained slicing injuries to his right hand, left hand, and left wrist, as well as bruises and scraping to his forehead, arms, lips, neck, legs, and penis.

[9] Because the defendant has invoked only the protections of the federal constitution, we decline to analyze the defendant's claim under our state constitution. "We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue." (Internal quotation marks omitted.) *State* v. *Johnson*, 140 Conn. App. 479, 481 n.2, 59 A.3d 366, cert. denied, 308 Conn. 917, 62 A.3d 527 (2013).

[10] The court stated the following to defense counsel: "Suppose, hypothetically, I accept your explanation that . . . the pool cue . . . was broken by one of the—the male participants, and that supports your general argument that there was some sort of violent struggle in the poolroom. Well, that could mean that everybody was not telling the truth when they said it was peaceful in the poolroom and the fight began at the bar. . . . [That] favors you in some way but . . . disfavors you in another because it doesn't mean that this was some sort of grabbing behind the bar."

[11] When asking some of these questions, the court purported to act as "the devil's advocate" and posed counterarguments to counsels' answers.

[12] For instance, during the state's rebuttal closing argument, the court asked the prosecutor whether the defendant's attempt to steal a shot of liquor from the bar could serve as the predicate crime for the felony murder charge. Realizing that it had not asked this question of defense counsel during her argument, the court informed defense counsel that she could "meditate on that" and that she would be given a chance to respond after the state finished its argument. Defense counsel did in fact respond to the court's query after the state finished its argument.

[13] We note that our conclusion is based on the fact that this case was tried before a panel of judges and not a jury. The distinct issue of whether it is improper for a judge to interrupt counsel during closing argument in a jury trial is not before this court.

———————————————————